TORBERT, Chief Justice.
This is an appeal from a final judgment, pursuant to Rule 54(b), A.R.Civ.P., in favor of plaintiff, A.E. Hughes, Jr., Inc. (Hughes), and against defendant, Midsouth Land Co., Inc. (Midsouth), dismissing a counterclaim filed by Midsouth against Hughes. The action was commenced by Hughes’s suit for a declaratory judgment against Midsouth on a contract between the parties. Mid-south filed a counterclaim, alleging causes of action for trespass, malicious trespass, breach of contract, rescission, and fraud. The plaintiff filed a motion to dismiss the counterclaim on two grounds: (1) failure to state a claim on which relief could be granted, and (2) that it affirmatively appeared from the complaint and admissions in the answer that the contract made the subject of the suit had been entered into in an effort to resolve a dispute arising from an earlier oral agreement and had amounted to a novation of the earlier agreement. The court granted the motion to dismiss, without specifying the ground(s) for dismissal.
The parties do not dispute whether the counterclaim stated a claim upon which relief could be granted. Therefore, the sole issue before this Court is whether the contract entered into by the parties in an attempt to settle the dispute bars Midsouth’s counterclaim against Hughes. We hold that it does not. Thus, we reverse and remand for trial.
The background facts, taken from the pleadings, are summarized in appellee’s brief thusly:
“Midsouth, an Alabama corporation, owned a parcel of real property in Mobile known as Central Business Park. Located on this property was a berm which is a long, narrow strip of earth rising several feet above normal ground. Hughes, also an Alabama corporation, orally obtained permission from Midsouth to enter upon Midsouth’s property to remove dirt from the berm.
“Hughes was to use the dirt for site preparation for construction of a building on a different parcel of property, also located in Central Business Park, under a construction contract with Imperial. Midsouth had orally given Hughes permission to remove dirt from the property owned by Midsouth. A dispute arose between Hughes and Midsouth as to the terms and conditions of the oral agreement and as to performance by Hughes under said oral agreement. Midsouth claimed that Hughes removed more dirt than had been orally agreed to.
*241 “On October 26, 1981, Midsouth and Hughes entered into a written contract in an effort to resolve their dispute. The contract provided that Vester J. Thompson, Jr., Inc., an independent engineer, would be employed to gather ‘necessary testing and engineering data’ and to supervise and inspect work to be performed under the terms of the contract. Furthermore, the contract stated: '
“ ‘... this agreement is to be supervised, inspected, tested by and to the satisfaction of the independent engineer, which shall be evidenced by a written report. ... ’
“The contract provided that Hughes was to perform the necessary work to cause the area to be graded to an agreed elevation and equivalent soil quality and relative density to that of the in situ soil before any excavation had taken place. The contract specified the classification of soil and provided how it was to be compacted on the site. To obtain the required elevations, soil quality and relative density, the contract specified that Hughes was to ‘remove the soil already placed [by Hughes in earlier attempts to correct the problem] unless it is practical to prove acceptable quality and density by sampling.’ All performance by Hughes was to be supervised by the independent engineer Thompson, and it was agreed:
“ ‘Upon completion of the work herein described and final approval by the independent engineer thereof in accordance with the provisions hereof, and the performance by the Contractor of all of its undertakings hereunder, the parties hereto do hereby each release and forever discharge the other from any liability, claim or demand of any kind or nature, relating to the removal of dirt from the property of the Owner.’
“The contract further stated:
“ ‘The services of Vester J. Thompson, Jr., Inc. shall be at the sole expense of the Contractor. Contractor shall, upon completion of the work to the satisfaction of the Engineer, pay to Owner the sum of $1,000.00 to partially defray expenses incurred by Owner.’ ”
According to Midsouth, neither Hughes nor Thompson performed under the contract.
These same facts, essentially, are again set forth in the counterclaim. For the specifics of those allegations, we look, first, to cause of action No. 1 stated in the counterclaim:
“[Hughes] caused the subject property to be bulldozed and cleared of all standing trees and shrubbery; huge amounts of earth to be excavated, and huge amounts of earth removed therefrom and transported to and deposited on said property of Imperial, leaving deep, gaping holes in the surface of subject property; top soil, tree limbs, trunks, debris were scraped into the holes and otherwise mixed into what was theretofore undisturbed soil capable of serving as foundation soil for buildings and other improvements, rendering the same unsatisfactory for said purposes; said excavation and removal of earth, and the scraping, bulldozing and other earthmoving activities reduced the elevation of substantial portions of subject property which were theretofore above the ‘flood plain’ as established by governmental authority as the minimum elevation for construction of improvements thereon, to a point below the flood plain, and other portions theretofore only slightly below it. All of the foregoing were performed by X under the direction of and with full knowledge of Hughes, and under authorization and direction and with the knowledge of Imperial, and without the consent of Counter-Plaintiff.”
Under its second cause of action, it was alleged that a trespass was “committed maliciously, or with reckless and wanton disregard" of the rights of Midsouth.”
Midsouth’s third claim alleged certain things that occurred after the execution of the contract:
“Hughes has failed and refused to perform its obligations under said contract to the extent that there has been a fail *242 ure of consideration on the part of Hughes. Under Paragraph 5 of the contract, Hughes was to complete work thereunder within 30 working days from the date of commencement; the date of commencement was a few days after the date of the contract, and on or about December 1, 1981, Hughes, having failed to perform its said obligations, expressly refused to do anything further by way of performance. Before any excavation took place on subject property, a substantial portion of it was at elevations at or above the ‘flood plain’ as established by the applicable governmental authorities, and that which was not above it was only slightly below it; and the soil was undisturbed, with trees and shrubbery growing thereon, a top layer of topsoil, and undisturbed silty sand for several feet below the topsoil. Under Paragraph 3 of the contract, Hughes was required to do the following:
“ ‘... provide all materials and equipment and perform the necessary work to cause the site area to be graded to the elevations reflected on Exhibit ‘B’ by the heavy dark contour lines, with equivalent soil quality and relative density to that of the in situ soil before any excavation took place.
“ ‘To obtain the requirement, as defined, the Contractor will remove the soil already placed, unless it is practical to prove acceptable quality and density by sampling.’
“Although Hughes removed a small quantity of soil already placed, it substantially failed and refused to remove huge quantities of soil which had irretrievably mixed therein black sandy topsoil, tree limbs, trunks, branches, shrubbery, leaves and other debris which had been theretofore scraped and bulldozed into place by Hughes or by others under the direction of Hughes. In such filling with soil obtained from Brookley Field, as was performed by Hughes, it failed to a substantial degree to achieve the elevations expressly fixed in the contract. At the elevations fixed in the contract, there was no topsoil in place before any excavation took place; yet Hughes, contrary to the contract provisions, placed a layer of topsoil at and below said elevations. In a substantial portion of the site area covered by the contract, after such purported performance of work as was done by Hughes, there was and remains today large quantities of topsoil to a depth substantially exceeding one foot, as well as large quantities of tree limbs, trunks, branches, shrubbery, leaves and other debris, which had been scraped and bulldozed into place by Hughes or by others under the direction of Hughes, and none of which comprise soil of equivalent quality to that in place before any excavation took place.
“22. Under Paragraph 8 of said contract, the release provisions were subject to three (3) conditions precedent, none of which were satisfied, viz., the work described in the contract was never completed, final approval by the independent engineer thereof was not made in accordance with the provisions of the contract, and the Contractor (Hughes) did not perform all of its undertakings thereunder.
“23. As a result of the breach by Hughes in performance under said contract, Midsouth has been damaged in that subject property is below the elevations agreed upon and the soil is not of the agreed quality, so that value of subject property has been severely diminished, the cost to perform the work not done by Hughes will be very great, and Midsouth has lost the benefit of the option money and sale of a part of subject property, all as hereinabove alleged.”
The fourth cause of action alleges that on December 1 and December 20,1981, Hughes expressly refused to perform any further work under the contract; whereupon, on January 13, 1982, Midsouth rescinded for failure of performance. On that ground, Midsouth renewed its action for malicious trespass.
Under the fifth cause of action, claiming fraud, these facts are alleged:
“At the time Hughes entered into the contract dated, to wit, October 26, 1981, *243 Hughes represented to Midsouth that Hughes intended to perform the obligations undertaken by it under said contract, and Midsouth relied upon said representations. At the time said representations were made by Hughes, it had no intention of performing the undertakings set out in said contract, and its representations were made to deceive Midsouth.
“28. On, to wit, January 13,1982, Mid-south provided Hughes with the report of tests made by Geotechnical Engineering-Testing, Inc., made at the request of Mid-south on or about January 4,1982, and of a survey performed by Rester & Coleman Engineers, Inc., demonstrating that soil of equivalent quality to that of the soil in' place before any excavation took place had not been provided, and that the elevations specified in said contract had not been provided, by Hughes; and proposed to Hughes a conference ‘in a final effort to resolve the differences’ between them. Said proposal was rejected by Hughes the day before this cause of action was commenced by Hughes.
“29. The misrepresentations made by Hughes, as aforesaid, were made maliciously and with intent to injure Mid-south.”
Before addressing the dispositive, issue, we need to recognize certain fundamental concepts, not here in dispute, but essential to our analysis. Hughes’s suit was initiated as a declaratory judgment action pursuant to Code 1975, § 6-6-220 et seq.; and, as such, it is subject to conventional rules of procedure. Campbell v. Shell, 289 Ala. 115, 266 So.2d 272 (1972). Counterclaims and crossclaims, under Rule 13, A.R. Civ.P., are, of course, an integral part of that procedure. The declaratory relief sought by the complaint is for the court to construe the contract; declare that Hughes has complied with its terms and provisions; and to release the parties from liability to each other with respect to the subject matter of the contract. Midsouth’s claim falls under Rule 13(a) as a compulsory counterclaim, seeking affirmative relief of a nature not embraced by Hughes’s prayer for relief. In the appropriate case, the court may grant relief to a crossclaimant or counter-claimant responding to an action for declaratory judgment. See, Alldredge v. Dunlap, 240 Ala. 27, 197 So. 36 (1940).
As we said at the outset, the issue presented for our review is the effect of the agreement entered into by the parties in an attempt to resolve their differences.
At the risk of some degree of oversimplification, we observe that the respective arguments of counsel proceed from totally different premises. Midsouth treats the settlement agreement as an executory accord; that is, if the accord calls for execution (performance) by one of the parties, the agreement does not extinguish the earlier obligation until the agreement is fully executed. Lauderdale County Cooperative v. Lansdell, 263 Ala. 557, 83 So.2d 201 (1955).
Hughes, on the other hand, treats the agreement as a binding arbitration contract and the engineer’s report as an award pursuant to that contract. Hughes argues that when an award is made pursuant to such a contract, the award operates as a bar to subsequent suits founded on the original claim or demand. Gardner v. Newman, 135 Ala. 522, 33 So. 179 (1902). Hughes argues that since the counterclaim on each cause of action arises from the initial dispute which the parties agreed to submit to arbitration, the award acts as a bar to the cross-claim.
We agree with the analysis of Mid-south that this agreement between the parties is not an agreement to enter into binding arbitration with the engineer serving as the arbiter. Rather, we are of the opinion that this agreement was an executory accord and that the engineer was employed only to supervise, inspect, and test the progress of the work.
There are two paragraphs in the contract which relate to the role of the engineer. They read as follows:
“4. The performance of the Contractor within the provisions of this agreement is to be supervised, inspected, tested by and to the satisfaction of the indepen *244 dent engineer, which shall be evidenced by a written report from the independent engineer to the parties.”
“8. Upon completion of the work herein described and final approval by the independent engineer thereof in accordance with the provisions hereof, and the performance by the Contractor of all of its undertakings hereunder, the parties hereto do hereby each release and forever discharge the other from any liability, claim or demand of any kind or nature, relating to the removal of dirt from the property of the Owner.”
The contract does not indicate that final approval by the engineer is in any way conclusive as to performance under this contract. In fact, section eight requires “final approval by the independent engineer" and “the performance by the contractor of all of its undertakings hereunder.” This indicates rather plainly that the approval of the engineer is only one of two conditions necessary for performance of the contract.
A contract may provide for inspection or approval by a third party without making that party’s judgment conclusive.
“Even though the contract provides that specified questions shall be determined by the architect or engineer, his decision is not final and conclusive unless the parties have so provided in plain and unequivocal language. A provision that the architect’s decision shall be conclusive as to certain matters has been construed to provide impliedly that it shall not be conclusive as to other matters. Where the contract does not make, or show an intention to make, the decision, estimate, or certificate final and conclusive, it does not have that effect, as where the provision for approval or rejection by the architect or engineer is intended merely as an additional safeguard against defects not ascertainable by an unskilled person.
“In such case the decision or certificate is prima facie, and only prima facie, evidence that the work has been performed according to the contract, and in an action by the contractor for compensation the owner can, without regard to such approval, show nonperformance of the work according to the contract; and that is particularly true where the contract provides that the certificate shall not lessen the final responsibility of the contractor, or exempt him from liability to replace defective work.”
17A C.J.S. Contracts § 498(8) (1963).
In C.P. Robbins & Associates v. Stevens, 53 Ala.App. 432, 301 So.2d 196 (Ala.Civ.App.1974), a similar result was reached. In that case the appellants argued that a determination by FHA or VA inspectors that the house was built in accordance with the plans and specification was conclusive in a suit between the parties concerning various defects in construction. In that case the Court of Civil Appeals held:
“Our examination of the warranty fails to disclose any condition precedent to liability thereunder which requires that VA or FHA inspectors shall be the final arbiters as to what is or is not construction in substantial conformity with the plans and specifications.

“... The adoption of FHA standards as a basis for warranty did not mean that a certification of compliance by the FHA was conclusive of plaintiffs’ rights under the warranty. The issue of substantial conformity was one of fact for the jury to be determined according to legal evidence.”
53 Ala.App. at 435, 301 So.2d at 198.
Likewise, in the case before us, the provision requiring supervision, inspection, and testing by the engineer is not conclusive of performance under the contract. The matters to be determined by the engineer would seem to be the type of technical data that the parties could not gather on their own concerning soil density, topography, etc., and other matters beyond the common knowledge of the parties. On the other hand, matters within the knowledge of the parties, particularly performance within the specified time period, was not to be determined by the engineer. In fact, the *245 record indicates that there was a dispute concerning whether Hughes had performed within the time period provided in the contract. Thus, we cannot agree with Hughes’s argument that the engineer was an arbiter and that the parties intended that the engineer’s report would serve as a binding arbitration award.
Since the engineer was not an arbiter, we are left to consider the nature of the underlying contract. That is, whether as Mid-south argues, this agreement is an executo-ry accord (thus allowing a suit on the underlying claim) or, as Hughes argues, the agreement is a novation (thus allowing suit only on this contract).
We are of the opinion that this agreement was an executory accord which did not extinguish the underlying claim until it was performed. The language of the contract itself supports this interpretation.. That is, it was not at the execution of the second contract that liability on the first contract was extinguished. Rather, it was only upon performance that liability was extinguished.
“8. Upon completion of the work herein described and final approval by the independent engineer thereof in accordance with the provisions hereof, and the performance by the Contractor of all of its undertakings hereunder, the parties hereto do hereby each release and forever discharge the other from any liability, claim or demand of any kind or nature, relating to the removal of dirt from the property of the Owner.”
It was only upon completion of the work under the contract that all liability relating to the underlying claim (removal of dirt in an improper manner) would be extinguished. If Midsouth can show failure to secure the approval of the engineer, failure to grade to fit the topographical map, failure to fill with dirt having the proper soil density, or failure to complete the work in 30 days, the defense of accord and satisfaction (an executory accord) would fail and a suit on the underlying claim would be allowed.
Thus, the motion to dismiss the counterclaim was improperly granted, and Mid-south, upon showing failure of performance of any of the conditions in the accord agreement, may sue on the original claim.
Finally, we note that Hughes filed a brief in the trial court in opposition to a motion by Midsouth to reconsider the dismissal of the counterclaim. Attached to the brief was a copy of the engineer’s report. The motion to reconsider was denied, resulting in this appeal. Hughes designated the report as a part of the record, whereupon the trial court, on motion of Midsouth, struck the report from the record. However, upon motion to reconsider this ruling, the trial court ordered that the record on appeal be supplemented by the addition of the engineer’s report. Midsouth made a motion in this court to strike this addition to the record by Hughes.
We need not reach this issue, however, since our determination in this case rests solely on an interpretation of the contract between the parties which is properly before this Court as part of the record.
The judgment is hereby reversed and the case remanded.
REVERSED AND REMANDED.
FAULKNER, ALMON, SHORES, EM-BRY, BEATTY and ADAMS, JJ., concur.
MADDOX and JONES, JJ., concur in the result.