892 A.2d 1185

**PHOENIX SERVICES LIMITED PARTNERSHIP**

v.

**JOHNS HOPKINS HOSPITAL.**

**No. 1050 Sept.Term, 2004.**

Court of Special Appeals of Maryland.

Feb. 27, 2006.

Andrew J. Graham (Laura Maroldy, Kramon & Graham, on the brief), Baltimore. Neil J. Ruther, on the brief, Towson, for Appellant.

Martin S. Himeles, Jr. (P. Andrew Torrez, Zuckerman Spaeder, L.L.P., on the brief), Baltimore, for Appellee.

Panel: MURPHY, C.J., HOLLANDER and ADKINS, JJ.

HOLLANDER, Judge.

This appeal is rooted in a contract dispute between Phoenix Services Limited Partnership ("Phoenix"), appellant, and Johns Hopkins Hospital ("JHH" or "Hopkins"), appellee. Under the contract, Phoenix was obligated to remove medical and other waste generated by JHH. In February 2003, seven years prior to the anticipated expiration of the contract, Hopkins terminated the parties' agreement. Claiming that the termination was "for cause," Hopkins refused to pay the early termination fee of approximately $5 million. Consequently, on March 14, 2003, Phoenix filed a "Complaint for Declaratory Relief" in the Circuit Court for Baltimore City. As amended, Phoenix sought a declaration, *inter alia,* that JHH unlawfully terminated the contract. In its answer and counterclaim, JHH sought opposing declarations.

The circuit court held a seven-day bench trial in March 2004. In a "Memorandum Opinion" dated June 18, 2004, the court ruled that JHH was justified in terminating the contract.

On July 7, 2004, the court issued its "Declaratory Judgment" in favor of JHH.

On appeal, Phoenix poses four questions, which we quote:

I. Did the circuit court err in rejecting the Certificate of the Independent Engineer and substituting its judgment for the Independent Engineer's "Certified Assurance"?

II. Did the circuit court err when it inserted into the parties' contract a new and additional requirement that the Independent Engineer's Certificate be unconditional and contain no assumptions?

III. Did the circuit court err in finding that the Independent Engineer did not certify that any changes had been made by Phoenix?

IV. Did the circuit court err when it refused to admit evidence that the plan certified by the Independent Engineer actually worked?

For the reasons that follow, we shall vacate and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

JHH and other Baltimore area hospitals (the "Founding Hospitals") contracted with Phoenix to create and operate a "Regional System" for the disposal of medical and non-medical waste. The parties' relationship is governed by a "Waste Supply Agreement" (the "Agreement") dated November 16, 1989, and the "First Amendment to Waste Supply Agreement" (the "Amendment"), dated November 15, 1994 (collectively, the "Contract").[2]

---

1. We shall present our factual summary chronologically. It is derived from the voluminous testimonial and documentary evidence presented at trial and from the outstanding briefs submitted by counsel for both sides.

2. The Agreement and the Amendment were executed by JHH and Medical Waste Associates Limited Partnership ("MWA"), the predecessor to Phoenix. Unless we are quoting from a document that provides otherwise, we shall use "Phoenix" to refer to Phoenix; its predecessor, MWA; and its successor, Curtis Bay Energy Limited Partnership.

In connection with the establishment of the Regional System, Phoenix constructed a facility in Baltimore City containing two large incinerators designed to dispose of both medical and non-medical waste (the "Facility"). Phoenix also established a "Transportation System" for the collection and conveyance of unsegregated medical and general waste from the Founding Hospitals to the Facility. *See* Agreement, ¶ 3.0.[3] Under the Contract, JHH was obligated to pay for the processing of a certain guaranteed annual tonnage of waste (the "GAT") for a period of twenty years. *See* Agreement, ¶ 6.0; ¶ 2.0. JHH produces an average of about 700,000 pounds of waste each month. At peak times, it produces 3,000 pounds of waste per hour.[4]

Article 3 of the Agreement pertains to "Disposal of Waste," while Article 4 pertains to the "Transportation System." It states, in part:

4.0. *Transportation.* In accordance with the Transportation Addendum, MWA, at its sole expense, shall, commencing on the Notification Date, transport all Acceptable Waste from Waste Supplier's place of business to the Facility in compliance with Applicable Law, subject to the other terms and conditions of this Agreement. As described in this Article, MWA shall provide certain equipment for the collection, storage and transportation of Acceptable Waste within Waste Supplier's place of business and from Waste Supplier's place of business to the Facility. The Transportation System shall be installed and operated according to the terms and conditions contained in the Transportation Ad-

---

**3.** The parties characterize the waste disposal system as "unique" because participating hospitals are not required to segregate regulated medical waste from general waste. In effect, all waste is handled as regulated medical waste with regard to the numerous federal and State regulations governing disposal and transportation of medical waste. During periods when the Facility's equipment was inoperative, however, other waste disposal facilities could handle hospital waste only if the regulated medical waste was segregated from general waste.

**4.** Hopkins claimed its "waste stream never exceeded the GAT for which it paid," but it paid for alternative waste service because of Phoenix's poor performance.

dendum. MWA shall at all times maintain the Transportation System in good working order.

4.1. *Disposal Carts.* Subject to the provisions of the Transportation Addendum, MWA shall provide to the Waste Supplier disposal carts ... for the purpose of collecting, storing and transporting Acceptable Waste to the Facility .... The number of such carts shall be reasonably sufficient to allow the collection and removal of all Acceptable Waste from Waste Supplier's place of business.....

Article 16, entitled "Dispute Resolution," states, in part:

(b) When the amount of the matter in controversy exceeds Two Hundred and Fifty Thousand Dollars ($250,-000.00), such Issue shall be decided by arbitration conducted by three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect, provided that the party to such arbitration shall have, for a period of six (6) months following initiation of such arbitration proceeding, all rights of discovery provided by the Maryland Rules of Civil Procedure and Practice then pertaining.

(c) The agreement to arbitrate contained in this Section shall be specifically enforceable under the Maryland Arbitration Act as amended. *The award rendered by the arbitrator(s) shall be final,* and judgment may be entered upon and in accordance with applicable law in any court having jurisdiction thereof.

(Emphasis added).

Pursuant to the "Recitals" portion of the Agreement, construction of the Regional System was to be financed, in part, "by tax-exempt bonds issued by the Maryland Industrial Development Finance Authority ("MIDFA")." The Agreement served as security for the bonds; because the bonds had a term of twenty-one years, "long term commitments" were sought for use of the Facility. Neil Ruther, Esquire, Vice–President and General Counsel for Phoenix, explained at trial that the bond underwriters' legal counsel insisted that the Agreement contain "strict provisions that would make it next

to impossible in all but the most extreme circumstances for the hospitals to cancel [their] agreements." Therefore, JHH was entitled to terminate the Agreement "for any reason," so long as it gave thirty days' notice *and* made a substantial payment to Phoenix in accordance with calculations specified in the Agreement. *See* Agreement, ¶ 14.2.

At the outset, JHH briefly participated in the Regional System. But, the parties agreed that Phoenix was then unable to service Hopkins adequately. JHH was not brought back into the system until 1992. Even then, JHH continued to experience problems with Phoenix's performance.

Ruther characterized Phoenix's performance during the period of 1992 to 1994 as "spotty." He acknowledged that "the system of carts ... was still problematic" and the plant was "in fairly severe financial difficulty." Ruther also recalled that, in the winter of 1994, Phoenix "was not able to process" appellee's waste "in accordance with the Contract." In February 1994, because of MWA's poor performance, JHH suspended its participation in the Regional System.[5]

Joanne E. Pollak, Esquire, Vice–President and General Counsel of JHH, wrote to Ruther on February 18, 1994. She said:

> JHH notifies MWA ... that MWA has not met its obligations under the Agreement and is incapable of curing such failure to perform without a substantial revision and/or reorganization of MWA's operations and finances. Because the health and welfare of JHH's patients and employees have been directly affected by MWA's prior inability to perform under the Agreement, JHH cannot permit resumption of MWA service until a long-range plan of meaningful correction has been agreed to by JHH and MWA.... During the plan development period, JHH will burn its own

---

5. Phoenix concedes in its brief that "JHH acted lawfully and appropriately in suspending its participation in 1994, before [its] bankruptcy reorganization and before Phoenix and JHH negotiated the First Amendment."

waste and the parties' obligations under the Agreement will be suspended.

* * *

Repeated telephone calls from representatives of JHH through the summer and fall of 1993 advised MWA of the repeated and severe breach of contract provisions. Meetings between representatives of JHH and MWA to discuss the deficiencies occurred on September 1, 1993, October 18, 1993, November 10, 1993, and December 20, 1993 . . . .

Despite these repeated notifications, meetings and correspondence, MWA's performance did not improve. Indeed, the consistent and persistent lack of performance culminated in a disastrous situation for JHH at the end of January [1994]. Over a period of several days, MWA did not perform and the waste accumulated at JHH causing severe health and safety hazards. The piles of trash and red-bag wastes were piled to the ceiling in the corridors in the basement of the Hospital and on the patient floors of the Hospital. Patients, visitors and professional personnel walked between walls of waste to travel from the Emergency Room to the X–Ray Department or up to the patient halls. Entranceways to elevators were blocked with stacks of waste. On many patient halls there was no room to move stretchers with patients between the piles of waste. Under any standard, MWA's performance was wholly inadequate . . . .

In contrast to the originally envisioned regional waste concept [under the Agreement] which would avoid continual contact with medical wastes by JHH's employees, these employees have been forced over the past year, and were forced during this recent critical period, to handle red-bag wastes on a continual basis . . . .

On June 13, 1994, Phoenix filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. As part of Phoenix's reorganization plan, Grotech Capital Group ("Gro-

tech"), a Maryland venture capital firm,[6] planned to invest over $7 million in Phoenix for various improvements. However, Grotech predicated its investment on JHH's willingness to resume supplying waste to Phoenix.[7]

As we discuss in more detail, *infra*, Hugh Woltzen, a CPA and managing director and partner of Grotech in 1994, and G. Daniel Shealer, Jr., Esquire, a vice president and deputy general counsel of JHH, both testified that: 1) Grotech wanted to assure Hopkins's continued participation under the Agreement and limit Hopkins's ability to arbitrarily terminate the Contract; and 2) Hopkins was willing to resume business with Phoenix only upon amendment of the Agreement to include specific standards of performance and provisions for early termination in the event that Phoenix failed to satisfy these standards. These objectives culminated in the Amendment of November 15, 1994.

Among other things, the Amendment contemplated a review of appellant's waste disposal system and Facility by an "Independent Engineer." As reflected in the Amendment, the parties agreed that R.W. Beck & Associates ("Beck")[8] would serve as the Independent Engineer. Pursuant to the "Recitals" section of the Amendment, Phoenix "proposed to make the additions, improvements, and renovations to the Facility" as set forth in Beck's report of April 20, 1994, which was attached to the Amendment as an exhibit (the "1994 Beck Report"). These changes were referred to as the "Capital Improvement Program."

---

6. The spelling of Grotech appears in two different ways on its letterhead: Grotech and GroTech. As most of the exhibits refer to Grotech, we shall do the same.

7. At the time of the Amendment, JHH provided approximately 25% of the total waste supply and cash flow coming into the Regional System from the Founding Hospitals. As the circuit court recognized, "if Phoenix does not collect medical waste from JHH, [Phoenix] will collapse and the other participating hospitals ... would have to find an alternative waste disposal system."

8. Beck is also referred to as R.W. Beck, Inc.

In ¶ 13(b) of the Amendment, JHH agreed to rescind the suspension of service on the "Effective Date" of the Contract. Pursuant to ¶ 13(a), the "Effective Date" was defined as the date on which Phoenix delivered to JHH "a certificate of the Independent Engineer stating that the JHH Capital Improvement Program has been completed." In 1996, after appellant provided JHH with Beck's certification, JHH lifted the suspension and resumed supplying waste to Phoenix.

The Amendment included various exhibits outlining Phoenix's duties to JHH. Pursuant to Exhibit I, titled "Transportation Addendum for The Johns Hopkins Hospital," Phoenix was required to make seven daily pickups according to a specific schedule. Moreover, it was required to arrive within sixty minutes before or after each scheduled pickup. Exhibit G, titled "Intermediate Sanctions," provided for a monetary penalty if Phoenix arrived beyond the scheduled time. It also said: "In addition, if the On–Time Pickup Rate for all Founding Hospitals for a month is less than 90%, within 5 Business Days after the end of the month MWA shall, in addition to the Sanctions, deposit $5,000 into the Transportation Improvement Fund."

Under ¶ 2.2 of the Amendment, the Contract was to continue until July 2, 2011. As outlined in ¶ 13(b), the Amendment included a multi-step process to terminate the Contract for cause: (1) the occurrence of a "Major Backup" and a written notice from JHH to appellant of cause for suspension (*see* Amendment, ¶¶ 13(b)(1)(A)-(C)); (2) JHH's issuance of a notice of suspension, if Phoenix failed to resolve the Major Backup within three hours of its receipt of the notice; (*see* ¶ 13(b)(1)(D)) [9] and (3) the failure of Phoenix to provide a Certificate of Reasonable Assurances (the "Certificate") from an agreed upon Independent Engineer, within the time provided (*see* ¶ 13(b)(1)(D)). In the absence of cause, however,

---

9. During the suspension period, Phoenix was still required to remove JHH's waste, pursuant to ¶ 13(b)(2) of the Amendment.

JHH could unilaterally buy out its participation, in accordance with a formula set forth in ¶ 14.2 of the Agreement.[10]

We quote from ¶ 13 of the Amendment, because it is central to this appeal:

(b) ... MWA recognizes that it has an obligation not again to impair the Waste Supplier's expectation of receiving performance under this Agreement.

(1) Accordingly, if at any time after the Effective Date, (A) MWA fails to make

(i) three Complete Scheduled Pickups (for purposes of this Section, a Complete Scheduled Pickup shall mean the arrival of an empty trailer with the capacity to haul 48 carts, as described on Exhibit I hereto) for which Sanctions are applicable under Exhibit G within a one week period or

(ii) three Complete Scheduled Pickups within a day for which Sanctions are applicable under Exhibit G, and

(B) the failure causes more than 50 carts of waste to be backed up at the Waste Supplier's facilities, and

(C) the Waste Supplier gives MWA a written notice of cause for suspension (which may be by facsimile) stating that, at the time of the notice, the pickups have not been made and MWA's failure to remedy the situation will result in suspension (the concurrence of events (A), (B) shall collectively constitute a "Major Backup"), and

(D) within three hours after receipt of the notice, MWA has not arrived at the Waste Supplier's loading facilities with sufficient tractors, trailers, equipment, and personnel to effect the prompt removal of all waste that was to have been removed by the missed or partial pickups, the Waste Supplier may, by the issuance of a notice of suspension not later than 30 hours after the Major Backup, cause the initiation of a suspension period. The suspension period shall continue until the Waste Supplier receives reasonable

---

**10.** According to Phoenix, as of early 2003, JHH anticipated that it would cost more than $5 million to cancel the Contract without cause.

assurances in the form of a certificate of the Independent Engineer stating that [Phoenix] *has made changes to the Transportation System or the Facility sufficient to prevent the recurrence of a failure to comply with the agreed upon schedule of pickups.* The failure of [Phoenix] to provide such certified assurance within the sooner of (i) 30 days (or such longer period not to exceed 60 days, as the Independent Engineer certifies to be needed to implement the corrective changes with due diligence) from the notice or (ii) the date agreed to by both parties shall constitute an Event of Default under the Waste Supply Agreement which, notwithstanding any other provision (including, without limitation, Section 14.1) of the Waste Supply Agreement to the contrary, shall give [JHH] the option of terminating the Waste Supply Agreement without penalty upon notice given during the suspension period.

(Emphasis added).

In sum, as JHH explains, under the Amendment "the requirements to *trigger* a suspension included both late pickups and a backup of waste, [but] the requirements to *lift* a suspension were focused exclusively on Phoenix's assured ability to meet the pickup schedule in the future; if Phoenix did not provide reasonable assurances that it would avoid future late deliveries, JHH was permitted to terminate— without any showing that there would be future backups."

Woltzen testified that he was "very involved all the way through" the negotiations that led to execution of the Amendment. He engaged in discussions with Colene Daniel, Vice–President of Corporate Services and Community Health and Services at JHH, as well as Shealer and Plank. According to Woltzen, Grotech would not agree to invest $7 million in Phoenix as part of its reorganization unless Hopkins, appellant's "largest customer," was committed to continuing its Agreement with Phoenix for the remaining term of the Contract. Woltzen explained:

[O]ur opinion was, [Phoenix] was not viable without the Hopkins contract. Furthermore, in our opinion, [JHH]

added two things, first thing was the largest amount of cash flow relative to the contract and second, Hopkins as important to us in this transaction because obviously it has a world class reputation as one of the finest hospitals in the country, in the world. They thought that would lead other people to believe this was a viable opportunity.

To be sure, Woltzen acknowledged that JHH was "very concerned [about the] recurrence of performance problems." Nevertheless, he reiterated that he "wasn't willing to invest [his] firm's money in the project without certification that Hopkins was going to be there," and participate "[t]hrough the life of the agreement...." Woltzen's "reaction" was, "we have got to have a contract [with JHH]. We have to know that cash flows are definitive, and you can't, based on a whim, change this contract based on anything, change this contract, it's a take or pay contract, that is [set] up to service those bonds, and we are not putting money in unless you are sure [Hopkins is] going to be there." Woltzen added: "I had to have [JHH] in the facility, there are no questions about that in my mind."

Of import here, Woltzen insisted that, from "a business standpoint," the language of § 13(b)(1)(D) regarding the Certificate made clear that the Independent Engineer's decision was binding. The following testimony is pertinent:

[COUNSEL FOR PHOENIX]: All right. Was there any discussion about the terms of [sic] conditions which Hopkins could leave the system?

[MR. WOLTZEN]: Well, there were discussions about what happened if something goes wrong. I wasn't willing to make the investment, unless I was actually sure they couldn't or wouldn't leave the system, but there was discussion about what would happen if there was a recurrence of the problem.

* * *

The substance was there was a series of events, notices, those kind of things, time, deadlines, those kind of things, *at the end of the day though, there was a final determination to be made that was almost like an arbitration. It was*

*basically, an engineer that comes in, looks at the facility* and provides, say, hey, [the] facility is adequate to service the hospital and the reason[s] for the fear have been taken care of, and we can go forward.

\* \* \*

[COUNSEL FOR PHOENIX]: Can you tell us what conversations there were between you and Hopkins concerning how that issue would finally be resolved, *who would make a decision?*

[MR. WOLTZEN]: *The independent engineer or the engineer.*

THE COURT: And what's the decision that the engineer is making?

[MR. WOLTZEN]: The decision, Your Honor, that the engineer is making that the plant is capable of performing as, under the contract.

[COUNSEL FOR PHOENIX]: And that kind of discussion would occur after what kind of event had occurred?

[MR. WOLTZEN]: After there had been some disruption of service, after they had gone into the process leading up to that.

[COUNSEL FOR PHOENIX]: When you left that investigation, could you tell the Court whether or not there was doubt in your mind whether there was a deal?

[MR. WOLTZEN]: No, *it was very clear to me and even after ten years, still is, that if we had a dispute, we would bring in the engineer for better or worse.*

[COUNSEL FOR PHOENIX]: You would have to live with the results?

[MR. WOLTZEN]: *We have to live with the results. They have to live with the results, and for better or worse would be determinative* whether or not they would go forward.

(Emphasis added).

On cross-examination, the following colloquy ensued:

[COUNSEL FOR JHH]: Okay. And if you were concerned about [the Contract] being iron-clad, you saw this language,

did you ever pick up the phone and call Dan Shealer or Colene Daniel, for instance, or anyone, and say, we need to put something in here that says the decision of the engineer is final, binding, conclusive, anything like that, did you ever do that?

[WOLTZEN]: There were a lot of discussions, and *I made it very clear to Dan Shealer, to Colene Daniel and everybody at Hopkins that we are not going to make our investment, unless we were sure they were going to be in here, and it was iron-clad. I was very clear on that* ....

\* \* \*

[COUNSEL FOR JHH]: Mr. Woltzen, my question to you is did you ever ask anyone to put in the agreement language that said not only that there would be a certificate of an engineer, but it would be binding or conclusive?

[WOLTZEN]: And the answer is yes.

[COUNSEL FOR JHH]: Well, when it wasn't in there, did you—

[WOLTZEN]: I think it is.

[COUNSEL FOR JHH]: Show me the language that says that?

[WOLTZEN]: It starts out in the same paragraph you said that says, suspension period shall continue until the company receives, or Hopkins receive reasonable assurances in the form of engineer certificate that it could go on period. I mean it can't be any more clear than that to me, at least on a business standpoint, it's clear.

(Emphasis added).

According to JHH, after the Amendment was executed "Phoenix's service was as poor as its predecessor's." [11] On January 8, 2003, one of Phoenix's two incinerators was shut down because of a rupture in the steel of the incinerator's

---

11. At trial, and in its brief, JHH recounts the many problems it allegedly experienced as a result of appellant's poor performance. We need not recount all of the evidence, however.

"water jacket." [12] Annette Fries, Senior Counsel for JHH, wrote to Michael Plank, President of Phoenix, on January 10, 2003, advising that "close to 300 carts" of waste had accumulated in the hallways of JHH. She stated: "[I]t is Phoenix's responsibility to remove the trash that is generated by this institution. Phoenix has consistently failed to do so. Please advise me immediately what steps Phoenix intents [sic] to take to remedy this intolerable situation immediately."

Thereafter, at approximately midnight on January 11, 2003, while one incinerator "was down for repair," Phoenix's other incinerator "ruptured," flooding the basement of the Facility.[13] Plank acknowledged at trial: "There was nothing we could do at that point but to shut the incinerator down because the water had risen to the level where it would have prevented us from running further. . . ." The water had to be pumped from the basement and, once the incinerators were repaired, they had to warm up for "six to eight" hours.[14] Plank conceded that, "for 26 hours," Phoenix lacked "any incineration capacity."

Consequently, from January 12, 2003, to January 14, 2003, Phoenix did not make all of its scheduled pickups at JHH. In particular, on Sunday, January 12, 2003, Phoenix failed to make all of JHH's scheduled pickups. On January 13, Phoenix made one of five scheduled pickups, at 10:00 p.m.; it

_____

12. At trial, Michael Plank, Phoenix's President, explained:

The ash from the incinerator, as it goes through the [incineration] process, the very back end of it, goes down into a small pit that's part of the incinerator and it's cooled by water. It's a piece of steal [sic]. Then there is water that flows [in]to it. And that piece, we call it a water jacket, and there was a rupture in that steal [sic]. . . .

\* \* \*

We had to stop processing for a while because we had to turn the cooler loop off while we tried to patch that steal [sic].

13. In its brief, Phoenix characterizes the event as a "catastrophic failure" of its second incinerator.

14. Even when the repairs were completed, the incinerators were not immediately operational. As Plank explained, the incinerators must reach 1700 degrees before they can accept any waste, and it "takes some time to go from zero to 17 hundred."

missed two and made the other two the next day. On January 14, Phoenix missed all five scheduled pickups; the only pickups on that date were two that had been scheduled for January 13, 2003.

At 3:37 p.m. on January 15, 2003, Shealer sent Plank and Ruther a letter, by facsimile, captioned: "Notice of Major Backup under the Waste Supply Agreement between The Johns Hopkins Hospital and Medical Waste Associates Limited Partnership dated October 2, 1989 as amended by the First Amendment to Waste Supply Agreement dated November 15, 1994 (the "Agreement")." [15] It said, in part:

I am writing in follow-up to Annette Fries' letter to Mr. Plank dated January 10, 2003, in which we notified you of a significant back-up of waste at The Johns Hopkins Hospital ("JHH") created by several missed pick-ups and further exacerbated by what we understand to be the partial shut down of the Medical Waste Associates Limited Partnership ("Phoenix") plant over the weekend.

Please be advised that Phoenix has missed three scheduled pick-ups on January 14: 4:00 p.m., 8:00 p.m., and 10:45 p.m. and two scheduled pick-ups on January 15: 7:00 a.m. and 12:30 p.m. This has caused a back-up of approximately 200 carts of waste at JHH. This letter constitutes written notice of cause for suspension. At the time of this notice, the pick-ups have not been made. Phoenix's failure to remedy the situation as provided for in the Agreement will result in the suspension under the Agreement.

JHH's transportation logs, admitted in evidence, showed that Phoenix was over sixty-one minutes late for the five scheduled pickups referenced in Shealer's letter. Three missed pickups, combined with substantial accumulation of waste, constituted a Major Backup under the Agreement.

JHH's Notice triggered Phoenix's obligation under the Amendment to remedy the Major Backup within three hours. Although an illegally parked truck blocked Phoenix's access to

---

15. The Notice was also hand-delivered on January 15, 2003.

the JHH loading dock until approximately 5:20 p.m. on January 15, 2003, the waste was not removed by 8:20 p.m., *i.e.*, within three hours of clearance of the dock. According to Plank, Phoenix's employees removed waste from JHH until 6:00 a.m. on January 16, 2003.

By facsimile on January 16, 2003, Shealer sent a "Notice of Suspension" to Plank and Ruther. It stated:

The Major Backup (as such term is defined in the Agreement) of which [JHH] notified [Phoenix] at 3:21 p.m. yesterday was not remedied in accordance with the terms of the Agreement. Accordingly, JHH is providing Phoenix with this notice of suspension, which causes the initiation of a suspension period.

During the suspension period, JHH will continue to deliver Acceptable Waste to Phoenix. Under the terms of the Agreement, Phoenix has an on-going responsibility to perform its duties under the Agreement utilizing Phoenix's Backup Systems (as defined in the Agreement). . . .

As noted, pursuant to ¶ 13(b)(1)(D) of the Agreement, in order to avoid an "Event of Default," Phoenix had thirty days in which to provide a Certificate of Reasonable Assurances from the Independent Engineer. To that end, Phoenix engaged Beck to satisfy its contractual obligations. In turn, Beck assigned the matter to Herbert Kosstrin, Ph.D.; since 1988, Kosstrin has been "a senior project manager" at Beck. Although Dr. Kosstrin holds a Bachelor of Science degree in Mechanical Engineering, a Masters Degree in Aerospace Engineering, and a doctorate in Mechanical and Aerospace Engineering, he is not a licensed professional engineer in any state.

On January 24, 2003, Richard Montgomery, Chairman of the Board of Phoenix, sent an email to Todd Gartrell, Director of the Department of Environmental Services at Hopkins, concerning "the scope" of Dr. Kosstrin's "review." Montgomery alerted JHH that Kosstrin would "focus on the causes for Phoenix not picking up the waste at the hospital," including "a review of the transportation system, the number of carts available to serve the hospital and the back up plan that was

in place at that time." Montgomery also alerted JHH that Kosstrin "wants to visit the hospital to familiarize himself with the hospital's requirements, facilities and resources and see how waste is delivered to the loading area for transport to Phoenix," and to "review the steps being proposed to prevent a repeat of such back up episodes." In addition, Montgomery indicated that he asked Kosstrin to "look at the total flow of waste from the hospital and determine if the current service template addresses the current needs of the hospital."

Kosstrin prepared the proposed Certificate, provided it to Phoenix for comment, and then incorporated Phoenix's comments. On February 14, 2003,[16] Beck sent its "Certificate of the Independent Engineer: Medical Waste Associates Changes to Facility Back–Up Plan," dated February 14, 2003, to Plank and Shealer under the signature "R.W. Beck, Inc." The cover letter accompanying the Certificate was also from Beck, and was signed by Kosstrin as "Principal and Senior Director, Special Projects." It stated:

Attached is our Certificate of the Independent Engineer which is being provided pursuant to Section 13(b)(1)(D) of the First Amendment of the Waste Supply Agreement between Medical Waste Associates Limited Partnership and John Hopkins Hospital.

In the Certificate, Beck explained that it reached its conclusions after it (1) visited the Facility; (2) met with representatives of Phoenix; (3) met with JHH and visited JHH's waste holding area and loading dock; (4) reviewed Phoenix's existing backup plan; and (5) reviewed Phoenix's revised backup plan, intended to prevent the recurrence of noncompliance. Beck also attached as Exhibit A to its Certificate, a four-page report discussing its findings.

In Exhibit A, Beck summarized Phoenix's backup plan at the time of the outages in January 2003, as follows:

In essence, MWA's primary plan was to minimize the waste received at the Facility via agreed upon measures with the

---

**16.** In its brief, JHH states that Phoenix provided the Certificate to JHH on February 24, 2003.

hospitals including, segregation of the general waste (clear bag) and medical waste (red bag), store as much waste as possible while the units are brought back online and bypass some waste to outside disposal facilities as necessary.... Prior to the time of the claimed Major Back–Up, one combustion system at the Facility was shutdown for scheduled maintenance and repairs. The one steam autoclave that could accept cart waste was awaiting delivery of parts to repair the size reduction system, while the second combustion system was experiencing mechanical issues with the ash sump and was forced to shut down at midnight (24:00 hours), Saturday, January 11, 2003. It took approximately 30 hours to return the first combustion system back into service. During this period, MWA reports that on Sunday, January 12, 2003, it requested the hospitals to segregate their wastes and stated that MWA would cause open top dumpsters to be delivered to the hospitals to take care of the general wastes....

\* \* \*

Although the incinerator forced outage occurred on Saturday night, January 11, 2003 and continued until Monday morning (05:45 hours) January 13, 2003, MWA started to see the effects of the outage on Tuesday and Wednesday when the flow of waste that needed to be incinerated was in excess of the 85 TPD permitted capacity of the single incinerator. This waste flow, combined with the inability of the hospital to segregate waste, resulted in saturation of storage at the Facility and in MWA missing some pick-ups.

Beck also indicated that "storage capacity [at the Facility] is limited," and the "inability to store waste puts constraints on the Facility when both incinerators are out of service." Further, Beck stated that, following the Notice of Suspension, Phoenix "has taken, or *has stated that it intends to add, a series of items and arrangements to the Facility.*" (Emphasis added). Beck continued:

The primary enhancement to the Facility is the purchase of additional storage trailers that are to be dedicated to the

Waste Supplier [i.e., JHH]. MWA has shown the Independent Engineer proof of delivery for 6 trailers with the capacity to store approximately 28 tons of waste. Such additional storage capacity should be able to accommodate approximately two days of [JHH's] waste generation .... In addition, completion of certain maintenance items has returned the Facility to full capacity.

In addition, Beck discussed appellant's "revised back-up plan," which "is to be initiated when there is the potential of a delay in processing deliveries from [JHH] that would cause the next pick-up to be missed." The revised backup plan involved the following elements: 1) taking advantage of additional onsite storage at the Facility; 2) maximizing use of the autoclaves for acceptable waste if JHH does not segregate the waste; 3) having additional storage at the Facility dedicated solely to JHH; 4) training of Phoenix employees in regard to the revised backup procedure; and 5) annual testing of the procedure. In Beck's opinion, the "revised back-up plan is dedicated to meeting the needs" of JHH.

Relying on Exhibit A, and noting that it "should be read in it's [sic] entirety," Beck opined in the Certificate:

Based on the Independent Engineer's review of the back-up plan, the configuration of the Facility, the length of previous dual incinerator outages, and the current waste generation of [JHH] *and assuming that* [Phoenix] 1) properly operates and maintains the Facility including *the timely implementation of renewals and replacements,* 2) actually initiates the back-up plan as soon as it cannot process [JHH's] deliveries, and 3) barring a force majeure type event, the Independent Engineer is of the opinion that [Phoenix] via it's [sic] revised back-up plan, which includes the procurement of additional dedicated storage for [JHH] at the Facility, has made changes to the Facility sufficient to prevent the recurrence of a failure to comply with the current agreed upon schedule of pick-ups.

(Emphasis added).

On February 25, 2003, Shealer wrote a detailed letter to Ruther, advising that JHH rejected Beck's Certificate "as a

reasonable assurance that [Phoenix] has made changes to the Transportation System or to the Facility sufficient to prevent the recurrence of a failure to comply with the agreed-upon schedule of pick-ups" (the "Termination Letter"). Therefore, Shealer informed Phoenix that its letter "serves as Notice of Termination of the Waste Supply Agreement, effective immediately."

Shealer explained that the Certificate failed to provide the requisite assurances

because, among other things, (i) Beck's certificate relies on the facts stated in Exhibit A, and material facts are not included in Exhibit A or considered by the certificate; and (ii) it does not identify any changes to the Transportation System or to the Facility that are sufficient to prevent a recurrence of the failure by Phoenix to comply with the agreed-upon schedule of pick-ups . . . .

In part, Shealer stated:

Beck's analysis simply considers a situation when both incinerators are out of service and does not address the other flaws with the Facility and/or Transportation System that clearly existed prior to the time that both incinerators became inoperable and which caused Phoenix to fail to comply with the agreed-upon schedule of pick-ups.

Further, Beck's calculation of available waste storage capacity at the Facility in the event that both incinerators become inoperable is flawed. Phoenix has multiple agreements with other hospitals pursuant to which it is obligated to accept medical waste. Beck's calculations assume that, during a period in which both incinerators are inoperable, Phoenix would cease to provide service to other hospitals to which it was legally obligated to provide service. This is not a realistic or appropriate assumption.

Claiming that the Certificate failed to "identify changes to the Transportation System or Facility," Shealer also asserted:

The changes contemplated by the First Amendment relate to the Facility and to the Transportation System. *They do not contemplate that the backup plan will be the way in*

*which Phoenix will meet its agreed upon schedule of pic-kups.* Rather, subsection 13(3) [of the Agreement] provides that the back-up system will be a redundancy, rather than a primary element of the Phoenix waste removal process. Beck's certificate expressly states that [the] "Independent Engineer is of the opinion that MWA via its revised back-up plan, ... has made changes to the Facility sufficient to prevent the recurrence of a failure to comply with the current agreed-upon schedule of pick-ups."

(Emphasis added).

Notably, Shealer did not challenge the Certificate on the ground that Kosstrin is not a licensed professional engineer. Shealer agreed to meet with representatives of Phoenix "to discuss the possibility of a continuing business relationship under a new legal agreement with different terms." According to Phoenix, that assertion evidenced JHH's calculated plan, "at the highest levels," to find a less expensive alternative to the Contract.

By letter dated February 26, 2003, Ruther responded to JHH's termination letter, stating: "No cause exists for such termination and Phoenix considers the agreement in full force and effect. Therefore, we will continue to provide service." During the pendency of the litigation, by agreement of the parties, Phoenix continued to collect JHH's waste on the same schedule and financial terms as if the Contract had not been terminated.[17]

At trial, Dr. Kosstrin testified that he was part of Beck's "energy asset consulting group," and in January 2003 he was part of the "general consulting group." [18] He testified generally as to the nature of his work:

---

17. As we discuss, *infra*, JHH moved *in limine* to exclude, on relevancy grounds, "all evidence relating to Phoenix's performance subsequent to JHH's termination of the Waste Supply Agreement on February 25, 2003." The court granted that motion.

18. Beck was not offered as an expert witness.

[T]he vast majority of my work I do technical due diligence on various waste projects and various alternative energy projects; that includes municipal solid waste, an example of that would be a Montgomery County solid waste system and resource recovery system. It also goes beyond that, being we have done work in the disposing of solid waste, done work with disposal of medical waste. All these in a due diligence fashion where we review the work of others primarily for the purpose of financing a project.

In addition to that, we have also assisted various entities in helping them contract out how to dispose of their waste
. . . .

I have also done a substantial amount of work in alternative energy . . . .

Kosstrin estimated that "the majority" of the sixty-five engineers at Beck's Boston office, where Kosstrin then worked, had engineering licenses. While Kosstrin acknowledged that he "did the majority of the drafting" of the Certificate, he claimed that "any report or certificate that leaves the office needs to be reviewed by a senior person" with a license in engineering. In this matter, said Kosstrin, the Certificate was reviewed by Ken Rush, a licensed engineer with twenty-five years of experience. Rush "was familiar with the project" because he "worked on it several times over the course of the last eight or nine or ten years. . . ."

Describing the steps he took in early 2003 "to decide whether R.W. Beck was going to issue a certificate," Kosstrin stated:

Well, first we looked at the particular clause in the contract to see what type of certificate was to be issued, depending on whether or not something happened. We then gathered information from both Phoenix and the Johns Hopkins Hospital, basically, the certificate was dealing with how to, I'm not sure of the proper words here, but how to give assurances to the hospital that certain things would not reoccur in the future, that the hospital was claiming had occurred sometime in January of 2003. So we investigated,

we tried to investigate what had happened. We talked to both sides as to see what they would propose to do to not have a situation reoccur. And then we independently looked at the system with our knowledge ....

\* \* \*

With respect to Phoenix, we asked them what happened, why they didn't, you know, continuously pick up the material, what was their outage history at the facility, how they intend to maintain the facility, and what was their backup plan in general, if incinerators go down, ... and we gathered the information ..., had additional conversation[s] to get more information as we made our review ....

\* \* \*

We reviewed that plan, we looked at it as we made our own independent judgment whether they thought that plan was adequate and reasonable. When there was a facility down time, when both units were down, whether Phoenix could continue to have some place to pick up the waste. With the incinerator and facility of this type, once you pick up the waste ..., you have to get the waste out of the carts and clean the carts, put the carts back into service, and there are really only two ways to do that, one is to put them in the incinerator and incinerate the waste, and the second one is put in temporary storage so that the carts can continue [as] part of the transportation system, going back and forth and picking up the medical waste from the hospital.

According to Kosstrin, a representative of JHH told Beck that there was "no problem with having sufficient carts in the System," and "there were sufficient carts." Because "it appeared from both sides [that] there was sufficient hospital carts," Kosstrin determined that this "was no longer an issue." Kosstrin elaborated on cross-examination: "If there weren't sufficient carts at the point of [the] major backup, as claimed, then we would have done some more with the cart work. This incident was defined by Hopkins that there were sufficient carts." Kosstrin added:

We next concentrated on the next part of the system, when you were dealing with waste and picking up at point A, you are taking to point B is it has to be somehow disposed of at point B, whether they immediately physically operate the incinerator or they put it on the dock, that if done later that becomes a critical process.

During Kosstrin's discussions with JHH, it became clear that Phoenix's "initial plan which was in place at the time . . . did not address the issue[s]." Therefore, "Phoenix came up with the second plan which used the idea of storage, dedicated to Hopkins," which Kosstrin regarded as "a reasonable method." He stated:

The last thing was really to calculate how much storage would be reasonable, giving enough margin of safety, so if a longer outage would occur. The other key point is what we wrote in our cert[ificate], is that the process of the backup plan needed to be initiated immediately upon the inability to dispose of waste at Phoenix['s] site. The reason for that is that delays in implementing the plan had the possibility of delaying the ability to pick up the waste at Hopkins. That was a real key issue in the plan, meeting the limitation of the plan, having a plan [and] not implementing it does not help.

Before issuing the Certificate, Beck "received confirmation" from Phoenix of a "purchase order for a storage trailer and a check paying for a storage trailer."

On cross-examination, Kosstrin stated that he was personally involved in the preparation of the 1994 Beck Report and in the underlying investigation of the incident in January 2003. Kosstrin maintained that he considered all causes for the Major Backup in January 2003, stating: "We think we looked at causes that happened and were relevant to this particular issue." In his view, the Major Backup in January 2003 was caused by "insufficient storage . . . to handle all that waste that was coming in at that time."

Yet, Kosstrin conceded that, at the time of the Notice of Suspension, Plank informed Kosstrin that Phoenix had space

for nine tons of waste, which "would have taken [care of] a large chunk" of the waste. He also stated that Plank informed him that, at the time of the dual incinerator outage on January 11, 2003, "there was no waste [in] storage at that point, at the facility." Kosstrin added: "[S]torage started to get filled up after that Monday, Tuesday, and Wednesday." Further, Kosstrin agreed that, as of January 11, 2003, "Phoenix was well behind in its pickups from Hopkins" and "it had not ameliorated that situation by putting waste in storage." Kosstrin recognized that, whether Phoenix's "backup plan called for putting [waste] in storage or not, it was available but they didn't implement it." Therefore, he indicated that Phoenix "needed a different backup plan."

According to Kosstrin, when he conducted the review in 2003, he understood the Certificate requirement as seeking reasonable assurances from Beck concerning the "capability of the system to perform," i.e., that the system must include "all the physical attributes necessary to meet the [pickup] schedule...." The following exchange is pertinent:

[COUNSEL FOR JHH]: Well, in certifying that the changes that had been made would enable Phoenix to comply with the pickup schedule, did you have in mind, one hundred percent compliance or did you have in mind 90 percent compliance?

[DR. KOSSTRIN]: The point of what we had reviewed, and what we did, was to put, have in place the physical attribute to allow them during the time when both incinerators were down to continue to serve the hospital. In this case, Johns Hopkins. So that with that, additional equipment, storage, at the facility, that allowed them to have the ability to continue to do what they had been doing with respect to pickup. Just keep to the pickup is to take the carts [sic], empty the carts and clean the carts and put it back on the truck.

\* \* \*

[COUNSEL FOR JHH]: The question was, Dr. Kosstrin, in reviewing the backup plan and preparing the cert[ificate],

you had in mind a one hundred percent on-time rate or 90 percent on-time rate?

[DR. KOSSTRIN]: We had in mind the ability for Phoenix to continually pick up the material at the hospital. In reality, I don't think anybody was going to do a hundred percent on-time pickup rate, every day in the year, every pickup.

* * *

We did not pick a number whether it is a hundred percent or 90 percent, but obviously should be a number between these two numbers.

[COUNSEL FOR JHH]: Okay. Now, did you understand that the transportation system was a critical component of what you were looking at?

[DR. KOSSTRIN]: Yes.

[COUNSEL FOR JHH]: And we say the transportation system, did you understand that the trucks, the carts on the trucks, the people operating the trucks, the people telling, dispatching the trucks, that that was a critical component? What were you looking at?

[DR. KOSSTRIN]: My understanding [of] the contract, a transportation system and the facility to find physical items, define physical items, did not define people[.]

[COUNSEL FOR JHH]: So your understanding was, you were looking at the physical embodiment of the transportation system and the facility and not anything having to do with the management?

[DR. KOSSTRIN]: The capability of the system to perform, that the physical attribute systems were in.

[COUNSEL FOR JHH]: Let me ask you this question, then Dr. Kosstrin, let me ask you, hypothetically, suppose you had taken a look at this, and had concluded that all the physical attributes necessary to meet the [pickup] schedule one hundred percent of [the] time were in place, but that the dispatchers were taking three hour breaks right smack in the middle of [the] delivery schedule, and other things of that sort, that amounts to poor work practices, as poor

management were happening, is it your testimony you would have felt comfortable issuing a cert[ificate] in these circumstances?

[DR. KOSSTRIN]: The part of the stuff that we look at, if you look at the system, we did not look at management and how management was operating the plant. We did look at some data which demonstrated what they had done from December, I believe, 2, through January 15. But no, we did not look at the dispatcher. . . .

\* \* \*

On the hypothetical basis that a dispatcher was continuously not in place, and continuously did not dispatch the truck, I obviously, that hypothetical situation, would not have gone by.

\* \* \*

THE COURT: [Y]ou use the phrase, not have gone by, does that mean you would not have issued a cert[ificate]?

[DR. KOSSTRIN]: We would have gotten some kind of assurance from management—

\* \* \*

[COUNSEL FOR JHH]: Okay. So isn't it accurate to say that you did not look simply at physical assets, but you also looked at management?

[DR. KOSSTRIN]: We looked at how to operate in the future. We did not look at hypothetical[s] in the past.

[COUNSEL FOR JHH]: Well, did you begin by attempting to identify the ca[u]se of the problem?

[DR. KOSSTRIN]: Yes, we did. We said what was the root cause of the situation at Phoenix.

[COUNSEL FOR JHH]: And is it your testimony, that in looking at the root cause, which is in the past, you looked only at physical assets, but in identifying the solution or certifying the solution, you looked at physical assets as management; is that your testimony?

[DR. KOSSTRIN]: What we did was, we looked at what prevented, or in other words, what had caused the backup

at Hopkins, identified that sufficient storage would allow Phoenix to continue to service Hopkins in the event of a duel incinerator outage, and that, yes, then they had to implement that plan. If the plan is not implemented, it doesn't do any good.

\* \* \*

[COUNSEL FOR JHH]: Now, did you attempt, Dr. Kosstrin to identify a single cause or every cause if there was more than one, of what had happened?

[DR. KOSSTRIN]: Well, when we started things, we thought there were two things, as you said, there's a transportation system, and there is a facility . . . .

I said the interface between the two is how you handle the carts at the facility. We didn't directly ask Hopkins, even we [sic] had a meeting with them, are there sufficient carts. That that was one of the things we were concerned about in the beginning which is, was the transportation system. . . .

With regard to Kosstrin's analysis of the cause of the Major Back-up in January 2003, the following exchange is also pertinent:

[COUNSEL FOR JHH]: Let me ask the question again, Doctor. Did you look to, or did you attempt to determine every cause, if there was more than one of what had happened or just one cause, and you have answered it in the sense that you said you also looked at carts. But now my question is, did you approach this with the goal of identifying as many causes as there were, or did you limit yourself to just one or just two?

[DR. KOSSTRIN]: [W]e looked at key aspects that could cause something, on the equipment side, were there enough tractors and trailer[s]. They had a contract with an outside firm to do the transportation, outside firm. There were sufficient carts dedicated to Hopkins. Hopkins said they had sufficient carts, then looked at two incinerators down, said they can't process, what do you do. You either store on site or you have to have the hospital agree to have

certain kind of desegregation at the hospital. Hopkins did know what to do anything [sic].

THE COURT: Was there any causes that you didn't look at. Yes or no, or I don't know?

[DR. KOSSTRIN]: We don't think so.

THE COURT: So you think you looked at every cause?

[DR. KOSSTRIN]: We think we looked at causes that happened and were relevant to this particular issue.

THE COURT: So you looked at every relevant cause?

[DR. KOSSTRIN]: We looked at and illuminated many, many things that were not relevant.

THE COURT: So you looked at every cause relevant or not?

[DR. KOSSTRIN]: No, I didn't say that. I said—

THE COURT: Did you look at all the relevant causes?

[DR. KOSSTRIN]: We believe we looked at relevant causes that cause backups.

THE COURT: All of them?

[DR. KOSSTRIN]: Physical?

THE COURT: All of them? All the physical causes?

[DR. KOSSTRIN]: That we believe we looked at physical causes, yes.

THE COURT: All the relevant physical causes?

[DR. KOSSTRIN]: What we thought was relevant.

THE COURT: Actually, I'm asking you, did you look at what you thought all—

[DR. KOSSTRIN]: What we thought were relevant causes.

In his testimony, Kosstrin asserted: "[A]lthough there were late pickups during the six-week period, the late pickup does not appear to cause the backup." He elaborated: "In reviewing the data, that demonstrated that Phoenix has the capability because they have done it, that they were picking up most of the pickups on schedule, and that *the reason for the major backup, was the inability to store . . . .*" (Emphasis added).

To be sure, Kosstrin recognized "that there was a number of pickups that were probably missed over a year's time period...." Nevertheless, he observed that "as long as the material did get picked up and taken away, that was what the real key was the service of the hospital." As part of the review, Kosstrin "checked if there were sufficient trailers available, and we went further to figure out ... what allows the carts to get back to the system." With regard to the sufficiency of trucks and trailers, he recalled: "[W]e asked [Phoenix] where the trucks and trailers come from, they informed us that they have a contract to the outside contractor for excess trucks and trailers, if one breaks down, they could call up and get another one."

In addition, Kosstrin stated: "[W]e looked at all the days," and there were some "fairly large numbers of delays, lateness." For example, he acknowledged that on December 8, 2003, some pickups were late by "seven hours, eight hours, [and] nine hours," which were "very substantially late deliveries...." However, Kosstrin asserted: "Since there was no notice of a major backup from [JHH at that time], we do not look at that as [a] major backup."

With regard to Phoenix's transportation records for pickups at JHH between December 12, 2002, and January 15, 2003, Kosstrin averred that the records demonstrated that appellant was "picking up most of the pickups on schedule...." Although he conceded that, on December 19, 2003, "eight pickups out of ten" were late, he insisted that the records also showed that Phoenix was "able to get on track within a day and a half" and, "even if the pickup[s] on the 19, 20 [of December 2003] were late, they did pick up all the carts that Hopkins delivered." Kosstrin explained: "[I]f you had consistent two or three hour delays ... there would be a buildup of waste between those points, and the key is being able to pick that stuff up and getting [it] out of the hospital."

The following exchange is pertinent:

[COUNSEL FOR JHH]: Now, Dr. Kosstrin, you were only looking to prevent late pickups where there was notice or

were you looking to ensure there was a system in place that would provide reasonable assurance that there would not be a failure to comply with the pickup schedule?

[DR. KOSSTRIN]: [Counsel for appellee], a system in place that allows Phoenix to do its job. We do not go into the management part of things in which, to ascertain on the management side whether Phoenix does actually do, will do the pickup in the future. This is equipment review.

[COUNSEL FOR JHH]: It was an equipment review, so the answer is, no, you were not looking—

[DR. KOSSTRIN]: The system, the equipment was in place.

The following colloquy is also noteworthy:

[COUNSEL FOR JHH]: So what you are suggesting then, you have here as [an] assumption, assuming that [Phoenix] actually initiated the backup plan as soon as it can to process waste supplier's delivery.

Now the backup plan that Mr. Plank gave to you, called for its implementation if the plant was down . . . .

[KOSSTRIN]: That was previous—

[COUNSEL FOR JHH]: Yes, and that was in effect from Mr. Plank's perspective from January 8[, 2003] through 11, right?

[KOSSTRIN]: I believe that is correct.

[COUNSEL FOR JHH]: And it called for implementation if the plant is down for four hours and would not be operational in the next two hours, right?

[KOSSTRIN]: That's what it said.

[COUNSEL FOR JHH]: So on January 8[, 2003] when the plant was down for 12 hours, this backup plan should have been implemented, right?

[KOSSTRIN]: That's what it said.

[COUNSEL FOR JHH]: If it had been implemented, then the waste of Hopkins would be put in storage, right?

[KOSSTRIN]: Some.

[COUNSEL FOR JHH]: That didn't happen, did it[?]

[KOSSTRIN]: Not according to the information that we read.

[COUNSEL FOR JHH]: [K]nowing that even with the backup plan for waste to be put in storage, Phoenix had not put waste in storage that came from Hopkins, did it concern you, Dr. Kosstrin, to assume that Phoenix actually, would actually initiate the backup plan ... ?

[KOSSTRIN]: *We had specific discussions with Phoenix management on this point, and we wrote this in there to emphasize that the backup plan has to be implemented, that has to be implemented quickly, if not, things will just run away* and would not be able to, because there is not enough time.... We put it in we had discussions ..., [and] *it would be a very strong point on our cert[ificate]*.

[COUNSEL FOR JHH]: *And you felt that Hopkins should be reasonably assured that not only would Phoenix [not] fail to make the same mistake and allow four days to go by without putting its waste in storage, but Phoenix would actually implement the backup plan and put the waste in storage, lickety-split immediately,* is that correct?

[KOSSTRIN]: *That's what I put in the cert[ificate], that's what is required, and we had to discuss [it] with Phoenix management.*

(Emphasis added).

While Kosstrin recognized that the Certificate contained "several assumptions" on which Beck's opinion was predicated, he maintained that there is "part assumption in most reports that we write when operations of a facility is involved." According to Kosstrin, the opinion expressed in the Certificate "assume[d] there were some pickups on the 12 th [of January, 2003]" during the dual incinerator outage. He stated: "Well the 12th and 13th, data I have here and stuff that I looked at indicated to me ... that there was a pickup on the 12th ... there were some pickup[s] on the 12th."

Under the revised backup plan, Kosstrin acknowledged that, in the event of a dual incinerator outage, it would take Phoenix longer to unload the carts of waste than it otherwise would.

Kosstrin conceded that the Certificate "does not explicitly state anything" about Phoenix having "employees available to address the need for additional employees to remove the waste from the carts[.]" According to Kosstrin, however, Beck was "informed by Phoenix ... that they have a temporary service which they can call if they need more manpower." And, Kosstrin believed that "the best proof in the pudding is [a] test over a period of time, after the changes were made, that show whether they worked or not."

Prior to trial, JHH moved *in limine* to bar any evidence of appellant's post-termination performance. Given the nature of the dispute, i.e., whether JHH was justified in terminating the Agreement based on deficiencies in the Certificate, Hopkins argued that appellant's "*subsequent* performance cannot possibly be relevant to the decision that JHH was required to make in February 2003 based on the information available at that time." In JHH's view, it "did not have the option to wait and see whether the backup plan described in the Certificate ... made any difference at all in Phoenix's performance[.]" Rather, relying on ¶ 13(b)(1)(D), JHH claimed that it "had two options: either terminate the Agreement if the assurances Phoenix provided were not reasonable ..., or accept the Certificate and continue performing under the Agreement."

The court granted JHH's motion. During trial, however, Phoenix moved for reconsideration, claiming the evidence "has relevance to important issues in this case...." Phoenix argued:

> In light of Hopkins' position that the Certificate was not dispositive and the Hospital was entitled to make its own determination as to whether "reasonable assurances" had been provided, Maryland Rules 5-401 and 5-402 make clear that the evidence of Phoenix's performance after it implemented the plan that the Independent Engineer certified, should be admitted. The fact that the plan in fact worked has clear relevance to the disputed question.

Counsel for Phoenix proffered the evidence it sought to offer as to its post-termination performance. Specifically,

appellant's counsel stated that it would offer a log of appellant's pickups which would show that,

since January 16, 2003 (i.e., the date of the Notice of Suspension), the on time percentage has been over 99 percent. I would also proffer that although the plant was experiencing some significant downtime since January 16, [2003,] Hopkins has been unaware of those occasions when they have occurred, and there have also been some backups at Hopkins, during this time period, despite the fact that Phoenix was making all the deliveries on time. All of which indicate that those backups were not caused by Phoenix, and that the plan instituted by Phoenix and certified by R.W. Beck, in fact, worked[.]

The court remained unpersuaded. Nonetheless, even without such evidence, the court denied JHH's motion for judgment. Hopkins then called Shealer as its sole witness.

With regard to negotiations concerning the Amendment, Shealer noted that there were several factors pertinent to Hopkins's decision to resume business with Phoenix, but "one primary, the overriding consideration was that [JHH] never find ourselves in the position that we were in prior to the catastrophic collapse, and a subcomponent of that was that we be assured that the operations were viable." He emphasized: "[I]f they weren't able to deliver on promise, that then we would be able to exit the relationship without penalty." In addition, Shealer stated:

I think we all recognized that if there were late, or missed pickups, it had the potential to cause major, major problems for Hopkins, and we also recognized that if there were episodic lateness or less severe or fewer number of lateness-es, that still would cause problems for Hopkins, but not of the nature of significant late or missed pickups.

The following testimony is also pertinent:

[COUNSEL FOR JHH]: And was that last component discussed at these meetings?

[SHEALER]: Yes.

[COUNSEL FOR JHH]: And was there any ambiguity in the way that Hopkins expressed its position?

[SHEALER]: No.

[COUNSEL FOR JHH]: Who expressed that position?

[SHEALER]: All the Hopkins representatives present, but that, and the invincible, the concept of not having to concern ourselves on how was it was happening [sic] at Phoenix, as we just wanted to get the waste out of the hospital was the overriding theme throughout the discussion.

[COUNSEL FOR JHH]: Now, did Grotech express [a] position with respect to any of these matters?

[SHEALER]: Yes.

[COUNSEL FOR JHH]: Okay. And let's start with, since it is the one that is most immediately relevant, the notion that if Phoenix was unable to perform . . . at the level that was promised, that Hopkins would be able to get out of the contract. What position—did Mr. Woltzen express [a] position on that?

[SHEALER]: Yes, he did.

[COUNSEL FOR JHH]: And what was his position?

[SHEALER]: He understood our position, but articulated very clearly the position of Grotech, that although, that Grotech was making an investment, and wanted to be sure that Grotech's interest was in assuring that Hopkins was not in a position to arbitrarily terminate the contract, unilaterally, arbitrarily terminate the contract.

\* \* \*

[COUNSEL FOR JHH]: Okay. Now, did you discuss with—well, let me ask you this. Have you been involved in the negotiations of agreements during the course of your legal career, in which there were provisions that provide— that call for the resolution of disagreement by a third party?

[SHEALER]: Yes.

[COUNSEL FOR JHH]: And what sort of provision that you personally have been involved in of that sort, involved in negotiations?

[SHEALER]: One of the potentially, one example would be a binding arbitration provision.

[COUNSEL FOR JHH]: When you negotiated with [counsel for Grotech], was there any discussion of either—well, first, was there any discussions of the determination of the reasonableness of assurances being submitted to an arbitrator for binding arbitration?

[SHEALER]: No.

[COUNSEL FOR JHH]: Was there any discussion of any third party having the right to make a binding determination on that issue?

[SHEALER]: No.

[COUNSEL FOR JHH]: Would Hopkins, would you have agreed to submit that determination to a third party for a binding determination?

[COUNSEL FOR PHOENIX]: Objection.

\* \* \*

[COUNSEL FOR JHH]: Did anyone every indicate, during your discussions with [Grotech's lawyer] or for that matter, your discussions with Mr. Woltzen or anyone else on behalf of Grotech, that the determination of the independent engineer was binding?

[SHEALER]: No.

[COUNSEL FOR JHH]: And who had chosen the independent engineer?

[SHEALER]: The independent engineer, I believe initially arose in the context of Grotech['s] evaluation of investment, and I believe Grotech chose the independent engineer at that time for that purpose.

[COUNSEL FOR JHH]: And when you say you believe, is there any question in your mind as to whether Hopkins chose the independent engineer?

[SHEALER]: Hopkins did not.

We also point to the following exchange:

[COUNSEL FOR PHOENIX]: You could not, in your view of the Medical Waste Agreement, kick Phoenix out and obtain other medical waste hauling?

[MR. SHEALER]: We did terminate the agreement.

[COUNSEL FOR PHOENIX]: Who was servicing the medical waste at that point?

[MR. SHEALER]: Phoenix is.

[COUNSEL FOR PHOENIX]: If you wanted to terminate them, why didn't you send them packing and tell them not to service your waste?

[MR. SHEALER]: Because we were giving Phoenix the benefit of the doubt and the opportunity to have the exercise that we are going through and have a determination, judicial determination of the termination.

[COUNSEL FOR PHOENIX]: So you were just being nice?

[MR. SHEALER]: That's one element of it, but we were also being prudent.

[COUNSEL FOR PHOENIX]: Well, isn't it true that you were, in fact, uncertain about whether you had the right to terminate Phoenix?

[MR. SHEALER]: No.

The parties filed post-trial memoranda in April 2004. Thereafter, on June 18, 2004, the court issued a thoughtful and well-written forty-two page "Memorandum Opinion," in which it ruled in favor of Hopkins.

The court articulated Phoenix's position, as follows:

[T]he Court's analysis should begin and end with the Certificate of the Independent Engineer because, even assuming there was a Major Backup, and that the Notice of Suspension was valid and properly issued, JHH received "reasonable assurances in the form of a certificate of the Independent Engineer stating that [Phoenix] has made changes to the Transportation System or the Facility sufficient to

prevent the recurrence of a failure to comply with the agreed upon schedule of pickups."

It also set forth JHH's position:

JHH argues that: (1) the Certificate is defective because it was not prepared by a licensed engineer; (2) it is facially defective because it does not give the certification required by the Amendment; (3) the judgment of the Engineer is not binding because the analysis was superficial and exhibited favoritism toward Phoenix; and (4) the Certificate does not provide the objectively reasonable assurances required by the Agreement.

According to the court, Hopkins had the burden to prove that Phoenix breached the Contract and that "it was justified in terminating the [C]ontract for cause." The court held that JHH proved that "(1) there was a Major Backup on January 15, 2003; (2) Phoenix failed to bring sufficient personnel and equipment to cure the Major Backup within the required three hours; and (3) its rejection of the Independent Engineer's Certificate was valid because the Certificate failed to provide reasonable assurance that [Phoenix] had made changes sufficient to prevent a recurrence."

As to the pickups, the court found that Phoenix "admitted that it failed to make the 4:00 p.m., 8:00 p.m., and 10:45 p.m. pickups on January 14th, thus it has admitted that it failed to make 'three Complete Scheduled pick-ups.'" The court recognized that Phoenix claimed "that none of those pickups was 'missed.'" Rather, Phoenix maintained that the pickups were not made at the scheduled times, and that its deviation from the schedule did not amount to a Major Backup because it was entitled to make up a missed pickup later during the week. The court regarded as "not credible" the testimony of Plank and Montgomery, challenging the accuracy of the transportation logs and disputing that Phoenix missed the pickups merely because they were not timely made. Rejecting Phoenix's attempt to distinguish a late pickup from a complete failure to make a pickup, the court reasoned that, "under the plain language of the Agreement, a late pickup *is the same* as

a failure to make a pickup under the Major Backup provision." In this regard, it noted that the Agreement used the word "scheduled," and a late pickup is not made when "scheduled."

Notably, the court concluded that, "if the Certificate did, on its face, provide reasonable assurance, that would end the suspension." But, the court was persuaded that "[n]o party has authority to challenge the Independent Engineer's recommendation or approval" in a facially valid certificate, because the Independent Engineer's determination is "final and conclusive." The court added: "Contrary to JHH's argument, there is nothing to suggest that JHH may challenge the certificate of reasonable assurance in section 13(b)(1) if, *on its face*, it provides 'reasonable assurance.'" (Emphasis added).

In reaching that conclusion, the court rejected JHH's attempt to distinguish the language in the reasonable assurance clause from that contained in the binding arbitration clause. The court said:

> JHH argues that the fact that the parties used explicit language requiring binding arbitration for certain disputes but did not use it in § 13(b)(1), shows that the Independent Engineer is not a binding arbitrator and JHH has the right to challenge whether the Certificate actually provides reasonable assurances.
>
> \* \* \*
>
> [F]or purposes of the certificate of reasonable assurance in section 13(b)(1) [of the Contract], the Independent Engineer is not an arbiter and thus the arbitration cases relied upon by JHH do not apply. Under section 13(b)(1), the Independent Engineer does not resolve a "dispute" between the parties. The parties do not "submit their differences" to the Independent Engineer for the Independent Engineer to make a "judgment" as to which side is correct. The Independent Engineer does not determine if the prerequisites for issuing a Notice of Suspension have been satisfied.[1]
>
> \* \* \*
>
> In fact, there is no requirement that the parties have any "differences." The parties may be in total agreement on

the prerequisites to the Notice of Suspension, including total agreement on what needs to happen to remedy the problem. Or they may be in disagreement. In either event, the Independent Engineer's task is not to solve the disagreement. **The Independent Engineer simply determines what, if any, changes Phoenix must make. If the Independent Engineer decides changes are necessary, the Independent Engineer also determines whether Phoenix has made those changes. The Independent Engineer then determines whether *in its judgment* the changes provide "reasonable assurances ... to prevent the recurrence of a failure to comply with the agreed upon schedule of pickups."**

(Italics in original; boldface added).

Upon concluding that it had the authority to assess the facial validity of the Certificate, the court found that the Certificate was, indeed, facially defective, because it did "not provide 'reasonable assurances ... that [Phoenix] has made changes to the Transportation System or the Facility sufficient to prevent the recurrence of a failure to comply with the agreed upon schedule of pickups.'" Characterizing the Certificate variously as "meaningless," "so vague that it is unclear," and "not worth the paper on which it is written," it determined that Phoenix failed to provide a Certificate that satisfied ¶ 13(b)(1)(D) of the Amendment.

In finding the Certificate facially flawed, the court rejected Phoenix's contention that the "assumptions" contained in the Certificate were merely standard disclaimers. The court reasoned:

The Certificate does not provide any assurance that changes *have been made* which will prevent a reoccurrence. This failure is crucial because the point of the Independent Engineer's certification is to relieve JHH from having to rely on plans that may or may not come to fruition. An examination of the Certificate reveals the defects. The first and most crucial defect is the word *"assuming."* Assumption is defined as "[a] statement accepted or supposed true

without proof or demonstration." AMERICAN HERITAGE DICTIONARY 136 (2d. c.ed. 1982). Thus, the Certificate effectively begins by stating that it accepts or supposes, *without proof or demonstration* "that [Phoenix]" will or is taking certain steps. As the Certificate is written it would be impossible for any party to hold R.W. Beck accountable if the assumptions fail to come true because R.W. Beck has certified nothing.

Second, the suppositions that it [i.e., the Certificate] makes are that some events will take place *in the future* but there is *nothing* in the certification that gives *any* assurance that [Phoenix] will in fact do what is assumed. The statement that the Independent Engineer is "*assuming* that MWA 1) properly operates and maintains the Facility including the timely implementation of renewals and replacements, [and] 2) actually initiates the back-up plan as soon as it cannot process the Waste Supplier's deliveries," is meaningless.... [ ] Nor is there *any* indication that the Independent Engineer has any expectation based on the factors outlined at the beginning of the sentence that the assumptions will come to fruition. It may well be that the *assumptions* are in fact well-founded, but as assumptions they do not give *any* reasonable assurance.... [B]ecause assumptions are by definition "accepted or supposed true without proof," the Independent Engineer undermines the opinion it provides.

Finally, as if to underscore that its opinion is based on unproven supposition, the Independent Engineer opines "that MWA via its revised backup plan, which *includes the procurement* of additional dedicated storage for the Waste Supplier at the Facility, has made changes ... sufficient to prevent the recurrence of a failure to comply with the ... schedule of pick-ups." The phrase "includes the procurement" is so vague that it is unclear whether the plan is to get additional storage in the future or if additional space has already been procured.

(Emphasis in original).[19]

The court continued: "The Certificate must stand on its own, and that is what makes the defects so crucial. With the assumptions and vague language, to put it bluntly, the Certificate is not worth the paper on which it is written." Comparing the Certificate to Beck's 1996 certification, the court stated:

> What Phoenix overlooks is that the actual certificate of completion issued in October 1996 did not leave the Independent Engineer any 'wiggle room.' It stated clearly and unequivocally:
>
>> [W]e are of the opinion that Phoenix has substantially completed the material elements of the Capital Improvement Program. Further we certify that those elements of the Capital Improvement Program which have been modified and those elements which have not been completed are not expected to have a material affect [sic] on the operation of the Facility and the delivery of services by Phoenix under the Waste Supply Agreement.
>
> The difference between that language and the language in the Certificate involved in the current controversy highlights the defect in language in the Certificate issued in 2003.

Conversely, the court rejected JHH's contention that the Certificate was invalid because Kosstrin is not a licensed professional engineer. The court recognized that, pursuant to Md.Code (2002 Repl.Vol.) §§ 14–501 and 14–502 of the Business Occupations & Professions Article ("B.O.P."), "it is illegal to practice engineering without a licen[s]e." [20] But, it reasoned:

---

19. In contrast, the court made clear that it did not regard the "force majeure" assumption in the Certificate as problematic. It explained: "[T]his assumption is simply a recognition of the uncertainty of life, similar to the assumption that most people made that when they go to bed at night, that they will wake up the next morning. By definition, a force majeure event is an event unlikely to occur."

20. B.O.P. § 14–501 states:

[A]s a factual matter, contrary to JHH's argument, R.W. Beck, and not Dr. Kosstrin, was the Independent Engineer. The Certificate is on R.W. Beck's letterhead and is signed R.W. Beck. The first sentence of the Certificate explicitly provides that the engineering firm R.W. Beck is the Independent Engineer: "This certificate is being provided by R.W. Beck, Inc., in its role as the Independent Engineer (the "Independent Engineer") pursuant to Section 13(b)(1)(D) of the First Amendment of the Waste Supply Agreement. . . ." JHH's letter rejecting the Certificate refer [sic] to it as: "Beck's certificate;" "Beck's conclusions;" "Beck's reason[ing];" "Beck's analysis;" and "Beck's calculation[s]."

Additionally, R.W. Beck played a major role in the decision of JHH to enter into the First Amendment as evidenced by Beck's letter dated April 20, 1994 which is attached to the First Amendment. That letter, like the Certificate in dispute, is signed "R.W. Beck." [ ]

The court also said:

[T]he Agreement does not require, and the licensing provisions relied upon by JHH do not require that a licenced [sic] engineer sign the Certificate. It is sufficient that the Certificate was signed "R.W. Beck." The fact that Dr. Kosstrin did most of the leg work does not make the Certificate invalid and even if Dr. Kosstrin did all the work, the Certificate is provided by R.W. Beck.[ ] If JHH was of the view that R.W. Beck was not qualified as the Independent Engineer, JHH could have said so before it signed the Agreement. Finally, JHH has failed to point to any provision in the Amendment calling for an illegal act, i.e., a violation of a statute or regulation. The agreement contemplates that the Certificate would be provided by an Independent Engineer; it does not require that an unlicenced [sic] engineer practice engineering.

---

"Except as otherwise provided . . ., a person may not practice . . . engineering in the State unless licensed by the Board [i.e., the State Board for Professional Engineers]".

On July 7, 2004 (docketed July 15, 2004), the court issued a "Declaratory Judgment" that provided, in part:

Phoenix Services Limited Partnership ("Phoenix") collects and disposes [of] medical waste from Johns Hopkins Hospital ("JHH") pursuant to a Waste Supply Agreement dated November 15, 1989 and First Amendment dated November 15, 1994 (referred to collectively as "the Agreement");

On January 15, 2003, there was a Major Backup of waste at JHH because Phoenix failed to make more than three Complete Scheduled Pickups for which Sanctions were applicable. The failed scheduled pickups were the 4:00 p.m., 8:00 p.m., and 10:45 p.m. pickups on January 14th and the 7:00 a.m. and 12:30 p.m. pickups on January 15th;

The failure to make those pickups resulted in the backup of substantially more than 50 carts of bagged waste, excluding waste on the floor and waste brought to the dock during the cleanup. The failure to make the pickups was not caused by a force majeure;

Notice of a Major Backup was sent to Phoenix by JHH and received by Phoenix by 3:50 p.m. on January 15, 2003. Because there was an illegally parked truck that blocked access to the JHH dock until 5:20 p.m., Phoenix had until no later than 8:20 p.m. to arrive at JHH with sufficient tractors, trailers, equipment, and personnel to effect the prompt removal of the more than 50 carts of waste. Phoenix did not get sufficient tractors, trailers, equipment, and personnel to JHH by 8:30 p.m.;

JHH gave Phoenix a Notice of Suspension and, within 30 days of receipt of that Notice, Phoenix was required to provide JHH with reasonable assurances in the form of a certificate of the Independent Engineer stating that it had made changes to the Transportation System or the Facility sufficient to prevent the recurrence of a failure to comply with the agreed upon schedule of pickups;

Phoenix provided a Certificate from the Independent Engineer within the 30 day period but the Certificate does not on its face give the required reasonable assurances;

Therefore, there was "an event of Default," and JHH had the option of terminating the Agreement without penalty. JHH did terminate the Agreement on February 25, 2003 and that termination was valid and without penalty....

We shall include additional facts in our discussion.

## II. DISCUSSION

### A.

The parties agree that the Contract is unambiguous. However, they vigorously disagree as to its meaning. Their disagreement has spawned numerous contentions.

Phoenix focuses primarily on the court's ruling pertaining to the Certificate.[21] It urges us to review *de novo* the court's decision as to the Certificate's validity, "because it concerns the interpretation of ... a written contract." Phoenix contends that the "parties were bound by the Independent Engineer's Certificate" because § 13(b)(1)(D) is "clear and unambiguous," and it "makes clear that the Independent Engineer's judgment was to be final and conclusive on the matters the parties delegated to the Independent Engineer for decision."

According to Phoenix, the circuit court "erroneously interpreted the provision in question...." The court, says Phoenix, improperly "assumed to itself the authority to judge whether the Certificate ... provided reasonable assurances, 'on its face.'" In doing so, declares Phoenix, the court "misinterpreted" the Contract; by its terms, and when "[r]ead as a whole," it did not authorize the parties or the court to challenge the determination of the Independent Engineer.

---

**21.** In the circuit court, appellant challenged JHH's termination of the Agreement on numerous grounds. On appeal, appellant states that it focuses "exclusively on the provision stating that the contract could not be terminated for cause unless Phoenix failed to present a certificate of the Independent Engineer that conformed to the contract's requirements." Nevertheless, Phoenix "maintains its position that there occurred neither a Major Back-up nor the contractual preconditions for a valid suspension ....", although "it is not pursuing those issues on appeal[.]"

Phoenix explains: " 'When parties to a valid contract refer any question of performance to the decision of . . . a third person, the decision contracted for is final.' " (Citation omitted). According to Phoenix, the Amendment "did not give either party or the court the authority to second-guess the Independent Engineer's judgment that Phoenix had made 'sufficient changes' to the Transportation System or the Facility." Nor did the Amendment require an "unconditional" Certificate. Once the Independent Engineer issued a Certificate that purported to provide reasonable assurances, says Phoenix, neither the court nor JHH could challenge either the facial validity of the Certificate or its substance. Therefore, Phoenix claims that the circuit court "erred when it interpreted the contract to say in effect that JHH or the court had the right to reject the Certificate of R.W. Beck on the ground that it found the Certificate, or the assurances, facially insufficient."

Phoenix adds:

[T]he contract made clear that the Independent Engineer's certificate need only "state" the Independent Engineer's judgment that Phoenix had made changes the Independent Engineer found sufficient to prevent a recurrence of a failure to comply with the schedule of pickups. Consistent with the principle that when the parties to a contract agree to submit such a question to a certifying engineer or architect, that professional's honest judgment is binding, absent fraud, the Independent Engineer's statement to Phoenix and JHH regarding "sufficient changes" was, by the parties' agreement, supposed to resolve the issue, without more. . . .

Phoenix provided the "certified assurance" called for by the contract and, pursuant to the clear terms of the contract, that should have ended the suspension. . . .

Although Phoenix maintains that § 13(b)(1)(D) of the Amendment is clear and unambiguous, it asserts that, in the event this Court finds, upon *de novo* review, that the clause is ambiguous, parol evidence "compels the conclusion" that the parties intended the Independent Engineer's decision to be

final and conclusive. Appellant asserts that "the extrinsic evidence that Phoenix offered conditionally at trial supports Phoenix's interpretation and compels the reversal of the trial court's decision. . . ." In support of its position, Phoenix asserts: "The Circuit Court's interpretation, that it or JHH could reject the Certificate if they found the assurances were not 'reasonable' on their face, is not consistent with the [extrinsic] evidence that the contract was intended to be virtually non-terminable." To illustrate, it points to Woltzen's testimony about the importance to Grotech of an "iron clad" deal between Phoenix and JHH, and to the evidence that "established that the contract was designed to be difficult to terminate," because it secured millions of dollars in bonds issued to pay for the construction of the Facility. As Phoenix notes, $24 million in principal was owed on the bonds when the Amendment was negotiated.

Further, appellant argues that the court "erred by adding to the contract a new and additional term, namely, the requirement that the Certificate contain no assumptions and be unconditional." In its view, "the two 'assumptions' that the trial court said rendered the Certificate from R.W. Beck 'worthless' were in fact common-sense, reasonable, and expected qualifications to an independent and professional opinion," and were merely "standard disclaimer[s]." According to Phoenix, "an assumption inherent in certifying any plan is that the entity concerned actually implement the plan." Moreover, Phoenix argues: "The fact that the certificate also contained forward-looking caveats does not detract from the 'certified assurance' by R.W. Beck that sufficient changes had been made as of the time it rendered the certificate."

In addition, Phoenix observes:

> The trial court did not cite any caselaw—from any jurisdiction—to support the proposition that an independent engineer's certificate . . . may not contain any assumptions, regardless of what the contract says. Nor did it cite any caselaw to support the proposition that such a term might properly be read into a contract. . . .

Appellant also suggests an "independent reason" that warrants reversal of the circuit court's ruling in regard to the Certificate: the court based its decision on clearly erroneous findings of fact. For example, appellant complains that the court erred in finding that Beck "did not indicate 'whether the plan is to get additional storage in the future or if additional space has already been procured.'" Phoenix observes that Exhibit A contained a section entitled "Changes To The Facility," in which Beck stated that appellant " 'has shown the Independent Engineer proof of delivery for 6 trailers with the capacity to store approximately 28 tons of waste.'" Moreover, Phoenix claims factual error with regard to the court's attempt to distinguish the 1996 Certificate, concerning the Capital Improvement Program, and the 2003 Certificate. Appellant contends: "[B]oth Certificates looked to the future in addition to certifying that Phoenix had, in fact, already taken certain steps to improve its operations."

Phoenix also contests the court's exclusion of evidence relating to its post-termination performance. In appellant's view, such evidence "was relevant to whether the Independent Engineer's certified assurance was 'reasonable,'" and to establish that JHH was not justified in terminating the Contract. To the contrary, says Phoenix, such evidence would have shown "that the plan had been implemented and worked, in practice." Thus, Phoenix urges us to award "a new trial at which such evidence will be admitted and considered...."

For its part, Hopkins argues that, under the Contract, it was entitled to challenge the adequacy of the Certificate with regard to its form and its substance. In its view, both were defective.

Hopkins insists that "an engineer's certificate is not binding unless the contract says it is." It maintains that, in order to relinquish its right to contest the Independent Engineer's conclusions in the Certificate, "JHH must have agreed to do so voluntarily, in clear and unambiguous language." In this matter, says Hopkins, there "is no statement—and certainly not the explicit statement required—that the Independent

Engineer's determination is 'final and conclusive,' or that he has the authority to resolve all disputes." Therefore, Hopkins contends that the trial court properly construed the Contract to permit a challenge to the facial validity of the Certificate.

Moreover, JHH argues that the court correctly determined that, in regard to the form of the Certificate, Beck did not satisfy the Amendment. JHH states:

> By its own terms ..., the certificate did not assure JHH, as required, that the changes Phoenix had made would *prevent the recurrence of a failure to comply with the schedule.* Rather, it stated that, *assuming the specified conditions were met,* such changes would prevent future failures. The conditions were simply stated as assumptions—the certificate offered no support for them—and Phoenix's history was strong evidence that there was no support to offer. In short, the certificate did not actually **certify** any facts, as the Amendment required it to do—it merely made dubious assumptions that provided no assurances, reasonable or otherwise.

Hopkins elaborates:

> The holding below was that the certificate failed to meet the requirement of form; instead of making the required statement or its substantial equivalent, the certificate began with assumptions that were preconditions to the sufficiency of Phoenix's changes. These conditions prevented the certificate from satisfying the clearly defined requirements of form, and without more required the court to find that the certificate did not meet Phoenix's contractual obligation.

Further, JHH posits that the assumptions underlying the Certificate were hardly the equivalent of a "standard disclaimer." Indeed, JHH accuses Phoenix of "the worst kind of sophistry when it argues that the Circuit Court, by requiring that the certificate be unconditional, 'added to the contract a new and additional term.'" According to appellee, the Agreement expressly required that the Certificate provide "reasonable assurances" in "the form of a simple statement, which it

spelled out clearly," and not conditional assumptions. Appellee asserts:

> Ironically, Phoenix's claim that the Circuit Court added to the contract a requirement that the certificate be unconditional is itself an attempt to rewrite the contract. It was clearly not the parties' intention that *any* document with the heading "Certificate" signed by the independent engineer satisfy the contractual requirement. . . . The trial court held only that Phoenix could not rewrite the bargain by conditioning the certificate on Phoenix's current problems.

Adopting the circuit court's reasoning, appellee points out that "the difference between the 1996 and 2003 certificates is stark: in 1996, Phoenix procured a certificate stating that it 'has substantially completed' its obligations; in 2003, Phoenix procured a certificate *'assuming'* that it would." (Citations omitted; footnote omitted; emphasis in original). Looking to Phoenix's record of poor performance, JHH also argues: "The conditions and assumptions in the certificate were necessary because of Phoenix's long history of financial and operational problems."

In this regard, JHH states: "Phoenix had lost millions of dollars, had been in default on its bonds for more than four years. . . . Its ability to continue in business was in grave doubt, and no responsible engineer could provide any assurance Phoenix would properly maintain the Facility, an essential precondition to on-time performance." JHH adds:

> Phoenix's ability to operate and maintain the Facility properly was called into question by its financial condition, which was so weak that its annual losses consumed its entire net worth and left it with a $3 million partners' deficit by the end of 2002. Its auditors were unwilling to certify its financial statements from 1997 through trial, and its 2002 draft financial statements questioned its ability to continue as a going concern. Phoenix's cash flow was so anemic that it had been in default on the bonds that financed the project since 1998. Phoenix was insolvent and existed at the bondholders' mercy; the day after the certificate was issued, the

bondholders could have accelerated payment of all principal and interest, putting Phoenix out of business. There was reason to question Phoenix's ability not just to operate and maintain the Facility, but to continue operations at all.

JHH insists, however, that its right to challenge the Certificate is not limited merely to the form of the Certificate. It argues:

Had the certificate satisfied the requirement of form, however, it would have been subject to evaluation to determine whether the certificate's assurances were reasonable. Absent contractual language expressly stating that the certificate is "final and conclusive," the parties had the right to challenge the engineer's conclusion.

JHH reasons:

The use of the term "reasonable assurances" is inconsistent with a construction that gives the engineer's determination binding effect. If "reasonable assurances" has any meaning ... then the mere delivery of a certificate cannot foreclose a judicial determination whether the certificate does in fact provide reasonable assurances. The Amendment's requirement of *"reasonable* assurances *in the form* of a certificate of the independent engineer" establishes two standards, one of form and one of substance. A certificate is sufficient in *form* if it is certified by the Independent Engineer and states that "changes have been made sufficient to prevent the recurrence of a failure to comply with the agreed upon schedule of pick-ups." A certificate must also meet a substantive standard, providing *reasonable assurances* that the changes made will in fact prevent such a recurrence.

While recognizing that the court's findings of fact "were a critical part" of its evaluation of the Certificate, JHH urges this Court to review the court's rulings under the "abuse of discretion" standard. JHH explains: "Phoenix's appeal does not challenge the Circuit Court's exclusively *legal* conclusion that the contractual provision requiring a certificate prepared by an independent engineer is binding upon JHH." (Emphasis

in original). Rather, says appellee, Phoenix challenges the court's *"application* of that legal standard to the factual findings it made with respect to this particular certificate." (Emphasis in original).

According to Hopkins, the "many factual errors and oversights in the certificate are an alternative basis for finding it insufficient as a matter of law." In particular, appellee offers "three alternative grounds" on which it relies to uphold the circuit court's "determination that the independent engineer's certificate was deficient." These include: (1) factual inaccuracies and "superficial analysis" by Beck; (2) lack of finality of the engineer's determination; and (3) Kosstrin's unlicensed status.

Appellee asserts that, even "if a contract provides that the engineer's judgment is 'final and conclusive,' that judgment must nevertheless be rejected if the engineer 'arrived at his conclusion under a clear mistake as to material facts.'" According to JHH, Kosstrin's "most glaring error was his conclusion concerning the cause of the Major Backup—his predicate for certifying the remedy." Appellee explains:

> In short, when Kosstrin wrote the certificate attributing the backup to insufficient storage, he believed that on the day both incinerators were out of commission Phoenix not only continued to make pickups from JHH, but made three more pickups than were scheduled and stored 240 carts of waste. Phoenix was well aware that no such pickups occurred.

Claiming that Kosstrin incorrectly focused on the Facility as the cause of the Major Backup, rather than the Transportation System, JHH asserts:

> Kosstrin's most glaring error was his conclusion concerning the cause of the Major Backup—his predicate for certifying the remedy. He found that the backup was caused by the failure of one incinerator while the other was already out of service for maintenance on January 11. The dual failure, he concluded, led to "the saturation of storage at the

Facility" 2½ days later, on January 14, as a result of which "MWA miss[ed] some pickups."

Consistent with the certificate, Kosstrin initially testified at trial that pick-ups were not delayed until January 14, 2½ days after the January 11 dual incinerator failure, and the sole cause of the delayed pickups and resulting backup was the "saturation of storage." And, Kosstrin testified, Phoenix made five pickups from JHH on January 12, the waste from which he assumed was stored because, with neither incinerator working, there was nothing else to do with it. Based on those "facts," he concluded in the certificate that Phoenix's purchase of additional trailers to store JHH's waste during dual outages would prevent future non-compliance with the delivery schedule.

But these facts were simply wrong. In fact, Phoenix's transportation logs establish what is not in dispute: Phoenix made *none* of the pickups from JHH scheduled for January 12, and it did not make the January 13 pickups until January 14.

Further, JHH argues:

Had Kosstrin recognized that Phoenix failed to make pickups for two days when all of Phoenix's storage was available, he could not possibly have attributed the Major Backup to insufficient storage.

As a result of this mistake, the certificate proposed nothing more than a backup plan that added storage trailers dedicated to JHH. But any reasonable person would know, on the facts presented below, that **storage was simply not the problem;** the backup began in December of 2002 and plainly existed when Phoenix had all 43 tons of its storage available. Thus, the backup plan outlined in the certificate *would not even have prevented the Major Backup;* it did nothing to assure *future schedule compliance,* as the Amendment required. **The certificate therefore found adequate a remedy—the addition of storage dedicated to**

JHH—that addressed *only* problems arising from storage shortages, which were not the cause of the backup.

(Italics in original; boldface added).

In support of its position, JHH vigorously complains in its brief, as it did at trial, that Kosstrin "never looked at Phoenix's contemporaneous transportation logs, misread summaries of the logs, and mistakenly believed that following the dual incinerator outage at midnight on January 11, Phoenix made six pickups at JHH on January 12, one on January 13, and stored the waste it picked up." To the contrary, asserts JHH, "Phoenix made *no* pickups from JHH on either date." According to Hopkins, Kosstrin also erroneously concluded that the effect of the incinerator outage on waste pickups was delayed until January 14, 2003, even though the effect "was immediate."

Therefore, JHH maintains that the Certificate was flawed because of its "[s]ilence concerning the Transportation System." In its view, Kosstrin "generated a certificate that placed a rubber stamp on Phoenix's proposed solution." Hopkins contends:

[T]he Transportation System was plainly intended to be at the heart of the independent engineer's work. But the certificate offered no analysis of or reference to the Transportation System and proposed no changes to it. Thus, the certificate addressed an issue that was *not* the cause of the missed pickups—storage—but failed to address what clearly *was* one of the causes of the backup: Phoenix's innumerable late and missed pickups when the incinerators were functioning properly.

At trial, the independent engineer all but admitted that he simply accepted what Phoenix told him concerning the Transportation System rather than forming an independent judgment. He conceded that the certificate addressed only late deliveries caused by the physical failure to get waste out of carts so the carts could be returned to JHH when the incinerators were not processing waste—not late deliveries that occurred when the incinerators were functioning.

JHH also maintains that the Certificate was a "nullity" because Kosstrin is "an unlicensed engineer in violation of Maryland law." In its view, the court erroneously determined that JHH waived this contention by failing to include a provision in the Amendment that required a licensed engineer to sign the Certificate. JHH notes the lack of authority "suggesting that a statutorily imposed requirement that protects the public can be subject to waiver or estoppel." Indeed, JHH argues: "If licensing provisions have any meaning, the Court cannot accept as satisfaction of a contractual requirement a document the preparation of which was a crime."

Moreover, JHH contends that " 'subsisting laws enter into and form part of a contract as if expressly referred to or incorporated in its terms.' " (Citation omitted). And, appellee argues that "Kosstrin is not merely an unlicensed agent acting on behalf of a licensed principal." Says Hopkins, "*Neither* Kosstrin nor Beck is licensed according to Maryland law; neither could legally have signed the certificate."

Further, Hopkins disputes appellant's complaint that the court erred when it barred evidence related to Phoenix's post-termination performance. JHH asserts: "[T]he quality of Phoenix's performance after this dispute arose is irrelevant not only because it came after JHH was required to decide whether to terminate, but also because Phoenix was on notice of the need for exemplary performance."

In its reply brief, Phoenix posits: "No magic words are required to make an engineer's determination final and conclusive." Moreover, it argues: "None of the cases Hopkins cites hold that it is only when a contract contains the words 'final and conclusive' that the determination of an engineer or architect on the matters reserved to it bind the parties."

Appellant also asserts that, "under Maryland law, the standard is not, as Hopkins claims, that the certificate may be rejected if the engineer made mistakes of fact, or even 'material facts.' " Phoenix reiterates that "nothing short of a determination that the engineer committed 'a mistake so gross as to imply bad faith or the failure to exercise honest judg-

ment' will justify rejection of the certificate." Phoenix explains:

> If the Independent Engineer's decision was not intended to be conclusive, then there was no point in having the certificate provision in the contract; instead, the parties would simply be required to go to court each time there was a dispute—an interpretation that does not make sense....

Hopkins's interpretation of the meaning of the certificate provision of the contract is absurd: Hopkins is suggesting that an engineer would, at great expense, do a substantive analysis and put its reputation on the line by rendering an opinion, and then the parties could completely ignore the engineer's finding and make their own decision as to whether in their lay opinion the certificate's assurances were reasonable.[ ]

Further, if it had been the parties' intention, as JHH claims, that they could debate the certificate, the contract could have (and undoubtedly would have) so stated, *e.g.,* "the engineer shall render a certificate which will resolve the dispute unless either of the parties disputes the reasonableness of the assurances, in which case the matter shall be brought to arbitration, or to court, as the case may be." Instead, the contract provides that only a failure to provide the *"certified assurance"* of the Independent Engineer within the time specified in the contract would constitute an "Event of Default" after a suspension.

Appellant adds:

> R.W. Beck was supposed to render a certificate that set forth its opinion, and it did so. That constituted the reasonable assurance under the contract. The certificate may not be rejected because the changes certified were to the Facility, rather than the Transportation System. Accordingly, even if this Court reaches this issue, it should reject Hopkins' argument because Hopkins failed to demonstrate that the Independent Engineer committed "a mistake so gross as to imply bad faith or a failure to exercise honest judg-

ment," which is what Maryland law requires to reject an engineer's certificate.

According to Phoenix, Beck's "decision" is the "equivalent of the award of an arbitrator and like such an award is final and conclusive on both parties. . . ." Looking to the Contract "as a whole," Phoenix claims it establishes that "the Independent Engineer was to exercise the role of final arbitrator in such matters as whether the appropriate changes had been made to the waste disposal system and facility to have Hopkins come back to the Regional System."

Phoenix also challenges JHH's assertions as to omissions in the Certificate concerning the Transportation System. Noting that JHH "did not offer any expert testimony to contradict Dr. Kosstrin's opinion or to impeach his methods," Phoenix claims that JHH's "assertion that the Independent Engineer had to address the Transportation System misstates the clear terms of the contract, which called for a statement that changes had been made to the Transportation System *or* the Facility." Phoenix states:

> [JHH's] argument tortures the plain language of the parties' contract, as well as the evidence. The contract says something very different from Hopkins' rendition: it states that the Independent Engineer was to certify that changes had been made "to the Transportation System *or* the Facility sufficient to prevent a recurrence of a failure to comply with the agreed upon schedule" of waste pickups. (emphasis added). The contract did not require that any changes to the Transportation System had to be made, or certified.

Moreover, Phoenix points out that the circuit court " 'did not reach' " the issue of whether the Certificate was based on factual error. And, it reminds us that an appellate court has no "power" to "make original findings of fact. . . ."

Phoenix also rejects the contention that the Certificate is invalid because Kosstrin is not a licensed engineer. It argues: "The contract did not require that the Independent Engineer, or anyone working on the matter, hold a Maryland License." Moreover, appellant suggests that "[a]ny complaints that Dr.

Kosstrin allegedly violated a Maryland statute should be addressed to the appropriate authority—the State Board for Professional Engineers . . . ." Regarding the licensure of Beck, Phoenix maintains that such contentions "are not properly before this Court," because appellant did not raise the issue before the circuit court. Alternatively, appellant urges that B.O.P. § 14–301 [22] "states only that certain 'individuals' must hold a license issued by the State Board"; it does not require that engineering firms hold a Maryland license.

## B.

The circuit court concluded that it was entitled to determine whether the Certificate, on its face, provided the requisite "reasonable assurances" contemplated by the Contract. But,

---

**22.** B.O.P. § 14–301 states:

**§ 14–301. License required; exceptions.**

(a) *In general.*—Except as otherwise provided in this title, an individual shall be licensed by the Board before the individual may practice engineering in the State.

(b) *Exceptions.*—This section does not apply to:

\* \* \*

(3) an officer or employee of a corporation, while the officer or employee practices engineering under the conditions authorized under § 14–302 of this subtitle;

(4) an employee or other subordinate of a professional engineer, while the subordinate practices engineering under the conditions authorized under § 14–303(a)(1) of this subtitle; or

(5) an employee of an individual who is not a professional engineer but who, nevertheless, is authorized to practice engineering, while the employee practices engineering under the conditions authorized under § 14–303(a)(2) of this subtitle.

B.O.P. § 14–303 states:

**§ 14–303. Practice by employees and other subordinates.**

(a) *In general.*—Subject to this section, the following individuals may practice engineering without a license:

(1) an employee or other subordinate of a professional engineer; and

(2) an employee of an individual who is not licensed but is otherwise authorized under this title to practice engineering without supervision.

(b) *Conditions.*—The authority to practice engineering under this section applies only while the employee or other subordinate works under the responsible charge of the licensee or other authorized individual.

if the form itself satisfied the Contract, the court was of the view that it had no authority to assess the adequacy of the content of the Certificate.

As noted, appellant contends that the "trial court erred when it interpreted the contract to say in effect that JHH or the court had the right to reject the Certificate of R.W. Beck on the ground that it found the Certificate, or the assurances, facially insufficient." In its view, the Amendment "made final and conclusive the Independent Engineer's determination of whether Phoenix had made 'sufficient changes' within the meaning of Section 13(b)(1)(D) of the First Amendment."

In analyzing this contention, we begin with a review of the well honed principles of contract construction.

██ "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to *de novo* review" by an appellate court. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 163, 829 A.2d 540 (2003); *see Myers v. Kayhoe,* 391 Md. 188, 198, 892 A.2d 520, 2006 WL 300447 (2006); *Towson Univer. v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004); *Lema v. Bank of Am., N.A.,* 375 Md. 625, 641, 826 A.2d 504 (2003). As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. *Mercy Med. Center, Inc. v. United Healthcare of the Mid-Atlantic,* 149 Md.App. 336, 372, 815 A.2d 886, *cert. denied,* 374 Md. 583, 824 A.2d 59 (2003).

██ To ascertain the parties' intent, courts "have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation." *Myers,* at 198, 892 A.2d 520; *see Taylor v. NationsBank, N.A.,* 365 Md. 166, 178, 776 A.2d 645 (2001). Under the objective law of contracts, when a contract is clear and unambiguous, "its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620 (2001).

The "primary source for determining the intention of the parties is the language of the contract itself." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029 (2001). Put another way, "the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999). Instead, the " 'test of what is meant is . . . what a reasonable person in the position of the parties would have thought' the contract meant." *Society of Am. Foresters v. Renewable Natural Res. Found.*, 114 Md. App. 224, 234, 689 A.2d 662 (1997) (citation omitted).

A contract is not ambiguous merely because the parties do not agree as to its meaning. *Fultz v. Shaffer*, 111 Md.App. 278, 299, 681 A.2d 568 (1996). Contractual language is considered ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person. *Ashton*, 354 Md. at 340, 731 A.2d 441; *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358 (1999). To determine whether a contract is susceptible of more than one meaning, the court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985).

In this regard, the terms of an agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001). Moreover, contracts are interpreted "as a whole to determine the parties'

intentions." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995). *See Ragin v. Porter Hayden Co.*, 133 Md. App. 116, 137, 754 A.2d 503 (2000). Similarly, a disputed term must be considered in context. *See Atl. Contracting & Material Co. v. Ullico Cas. Co.*, 380 Md. 285, 301, 844 A.2d 460 (2004).

 If a trial court finds that a contract is ambiguous, it may receive parol evidence to clarify the meaning. *See Beale v. Am. Nat'l. Lawyers Ins. Reciprocal*, 379 Md. 643, 660, 843 A.2d 78 (2004); *Bushey v. N. Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598 (2001). On the other hand, "evidence is ordinarily inadmissible to vary, alter, or contradict a contract that is complete and unambiguous." *Higgins v. Barnes*, 310 Md. 532, 537, 530 A.2d 724 (1987). Notably, it is not the province of the court to rewrite the terms of a contract so as to avoid hardship to a party, or because one party has become dissatisfied with its terms. *See Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 350, 322 A.2d 866 (1974); *Fultz*, 111 Md.App. at 298, 681 A.2d 568.

Applying the principles of contract construction outlined above, we agree with the parties that ¶ 13(b)(1)(D) of the Amendment is unambiguous.[23] However, we reject appellant's contention that, based on the terms of the provision, the Independent Engineer's mere issuance of the Certificate foreclosed JHH's right to challenge its facial or substantive adequacy in court. We explain.

---

**23.** For convenience, we restate the terms of the provision:

The suspension period shall continue until [JHH] receives *reasonable assurances in the form of a certificate of the Independent Engineer stating that [Phoenix] has made changes to the Transportation System or the Facility sufficient to prevent the recurrence of a failure to comply with the agreed upon schedule of pickups.* The failure of [Phoenix] to provide such certified assurance within ... 30 days ... from the notice [of suspension] ... shall constitute an Event of Default under the Waste Supply Agreement which ... shall give [JHH] the option of terminating the Waste Supply Agreement without penalty upon notice given during the suspension period.
(Italics and boldface added).

It is well established that parties may enter into contracts in which the adequacy of performance is expressly made subject to the approval or certification of a designated third person or entity, such as an architect or engineer. *See, e.g., Laurel Race Course, Inc. v. Regal Constr. Co., Inc.,* 274 Md. 142, 333 A.2d 319 (1975); *Chas. Burton Builders, Inc. v. L & S Constr. Co., Inc.,* 260 Md. 66, 84, 271 A.2d 534 (1970); *City of Baltimore v. Allied Contractors, Inc.,* 236 Md. 534, 545, 204 A.2d 546 (1964); *Devoine Co., Inc. v. International Co., Inc.,* 151 Md. 690, 693–94, 136 A. 37 (1927); *J.A. La Porte Corp. v. Mayor and City Council of Baltimore,* 13 F.Supp. 795, 799 (D.Md.1936). Indeed, "[s]uch agreements have been held enforceable in almost every state." 14 WILLISTON ON CONTRACTS § 42.24 at 524 (4th ed. 2000) ("WILLISTON"). *See* 8 CORBIN ON CONTRACTS § 31.11 at 99 (1999 ed.). Conversely, "[a] contract may [also] provide for ... approval by a third party without making that party's judgment conclusive." *Midsouth Land Co., Inc. v. A.E. Hughes, Jr., Inc.,* 434 So.2d 239, 244 (Ala.1983).

Generally, when a disputed matter is referred by contract for final and binding decision by a third party, the decision "is final in the absence of fraud or bad faith ...." *Chas. Burton Builders,* 260 Md. at 84, 271 A.2d 534. When the third party, such as an architect or engineer, refuses to issue a certificate "as a result of a clear mistake as to material facts, relief seems proper...." 14 WILLISTON, § 42.22, at 519–20. On the other hand, if knowledge of the facts is adequate but the third party's judgment is regarded as flawed or unreasonable, the court may not substitute its judgment for that of the "third-party professional for whose judgment the contract provided." *Id.*

In support of its position that the Independent Engineer was "the final arbiter of the matters delegated to" him under the Amendment, including the reasonable assurances, appellant refers us to several other provisions in the Contract. Phoenix asserts:

In fact, the very first page of the First Amendment is replete with references to the Independent Engineer's role in certifying that the system had been improved sufficiently to justify JHH's re-joining the Regional System after the 1994 Phoenix bankruptcy reorganization. Indeed, the First Amendment was not to become effective until the Transportation System had satisfied a performance test and the JHH Capital Improvement Program was completed; and it was the Independent Engineer who was to certify that those events had occurred. . . .

The contract also establishes that the parties had agreed that the Independent Engineer was to decide any disputes . . . regarding the Base Weight of each cart used to transport waste between the hospital and Phoenix. Likewise, the Independent Engineer was to be the arbiter of what changes, if any, could be made to the Capital Improvement Program. . . .

In addition, the parties agreed that only costs for improvements recommended or approved by the Independent Engineer could be paid from the Transportation Fund. They agreed that the Independent Engineer was to be the arbiter to certify whether the design of a cart was reasonable. Furthermore, the parties agreed that it was the Independent Engineer who was to decide what constituted a "reasonable reserve" of equipment, under the Transportation Addendum to the First Amendment.

In *United States v. Moorman*, 338 U.S. 457, 462, 70 S.Ct. 288, 94 L.Ed. 256 (1950), the Supreme Court recognized that "the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language." Yet, the Supreme Court added: "[T]his does not mean that hostility to such provisions can justify blindness to a plain intent of parties to adopt this method for settlement of their disputes. Nor should such an agreement of parties be frustrated by judicial 'interpretation' of contracts." *Id. Cf. Questar Homes of the Avalon, LLC v. Pillar Construction, Inc.*, 388 Md. 675, 686–87, 882 A.2d 288 (2005) (acknowledging that "parties have the option to waive

their right to arbitration," but waiver " 'must be clearly established and will not be inferred from equivocal acts or language' "); *Moore v. Jacobsen*, 373 Md. 185, 817 A.2d 212 (2003) (concluding that, because alimony ordinarily terminates upon remarriage as a matter of statutory law, an agreement to continue alimony after remarriage must be clear and unequivocal in order to be enforceable); *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103, 107–108, 468 A.2d 91 (1983) (recognizing that "[a]rbitration is a matter of contract" and a "party cannot be required to submit any dispute to arbitration that it has not agreed to submit"; when parties disagree as to scope of arbitration provision, "question of substantive arbitrability should be left to the decision of the arbitrator").

 The question here is whether the Contract delegated final and binding authority to the Independent Engineer in regard to the Certificate. Noticeably absent from the text of the clause is any language suggesting that the Certificate is "final and conclusive" or otherwise binding and not subject to challenge of any sort by the parties. In weighing the omission of such language, we are mindful that, ordinarily, parties to a contract are entitled to turn to the courts to resolve disputes arising from a contract. *See Zimmerman v. Marymor*, 290 Pa. 299, 138 A. 824, 825 (1927) ("As the effect of the architect's certificate is to deprive a party of trial by jury, it must be construed strictly.").

 As we see it, in order for a contract to foreclose or waive the important right of a party to challenge or litigate the conclusions of a third party, the parties to the contract must clearly and expressly agree that the third party's determination is final, binding, and conclusive. Put another way, they must use unequivocal language that unmistakably evidences the parties' intent, because "the contract must leave no doubt that this was intended." 14 WILLISTON § 42.24 at 531 (citing *United Constr. Co. v. Haverhill*, 22 F.2d 256 (2nd Cir.1927)). *See also Subsurfco., Inc. v. B–Y Water Dist.*, 337 N.W.2d 448, 453 (S.D.1983) ("[T]o make such a certificate or decision conclusive requires plain language in the contract. It

is not to be implied"). If, as Phoenix suggests, the Amendment conferred final, exclusive, and binding authority upon the Independent Engineer, the Contract should have so stated, using clear, express, and unequivocal language. It did not do so.

In reaching our conclusion, we are guided by the spirit of *Moore v. Jacobsen,* 373 Md. at 190, 817 A.2d 212, despite its factual differences. There, the parties entered into a voluntary separation agreement which, among other things, provided for the payment of alimony to the wife for a term of seven years. The alimony clause provided that it was "non-modifiable...." *Id.* at 187, 817 A.2d 212. It also stated "that no court shall have the power to modify this agreement with respect to alimony, support or maintenance of either spouse except as provided herein." *Id.* A few months after the parties were divorced, the wife remarried, prompting the husband to cease payment of alimony. Claiming that she was entitled to the continuation of alimony for seven years, despite remarriage, the wife sought a judgment against the husband for the unpaid alimony. *Id.* at 187–88, 817 A.2d 212.

On appeal, the Court considered "whether the provision in the parties' separation agreement obligating the husband to pay alimony to the wife terminated upon the wife's remarriage, despite the fact that the agreement provided that alimony was 'non-modifiable' by a court and payable for a term of seven years ...." *Id.* at 187, 817 A.2d 212. Employing the principles of contract and statutory interpretation, it concluded that the provision in the agreement precluding *modification* of alimony by the court was insufficient to preclude *termination* of alimony *upon remarriage.* Of import here, the Court held "that, unless an agreement states explicitly that alimony survives a party's remarriage, alimony terminates on the marriage of the recipient spouse." *Id.*

Undergirding the Court's holding was the statutory provision expressly mandating that alimony terminates upon remarriage, "[u]nless the parties agree otherwise." *See* F.L. § 11–108(2). In the Court's view, the "statutory presumption"

of termination controlled because the parties' agreement was not sufficiently explicit to permit the continuation of alimony upon remarriage, in light of the statutory provision. *Id.* at 190, 817 A.2d 212.

The Court was mindful that, "[u]nder Maryland law, alimony has historically terminated on the remarriage of the recipient spouse." *Id.* Yet, it also recognized the important right of parties to contract freely. As a matter of "public policy," said the Court, F.L. § 11–108 embodies both principles, by providing that alimony terminates upon remarriage, *unless the parties agree otherwise. Id.* Because of the absence of clear and precise language in the agreement, the Court concluded that the provisions as to continued alimony must give way to the statutory provision requiring its termination upon remarriage. The Court reasoned, *id.* at 190–91, 817 A.2d 212:

The public policy set forth in § 11–108 clearly states that alimony does not survive the remarriage of the recipient. *To create an exception to that policy, an agreement must be equally clear. We think a bright-line rule requiring an express provision providing that support shall not terminate upon remarriage fosters certainty, resolves ambiguity and reduces litigation.* "To permit [the statute's] mandate to be overcome by implication would introduce ambiguity, encourage litigation and, thereby, undermine the statute's purpose." *Radford v. Radford,* 16 Va.App. 812, 433 S.E.2d 35, 36 (Va.Ct.App.1993).

*If the parties had intended that alimony would continue after remarriage, they should have, and could have, included an express requirement in the agreement.* They included an express requirement in the agreement as to the termination of child support. *See supra* note 2. We do not construe the language contained in 8.0 of the agreement before us to evidence an intent of the parties that petitioner was required to continue to pay alimony to respondent for seven years, even if she remarries.

(Emphasis added).

The Maryland cases involving third-party engineering and architectural determinations similarly suggest that clarity is

key in any contract purporting to remove a case from the judicial process by rendering binding and conclusive the decision of a third party. In marked contrast to the case *sub judice,* for example, in *J.A. La Porte, supra,* 13 F.Supp. at 797, the contract stated, in part:

> To prevent disputes and litigation, the Chief Engineer shall in all cases determine the amount, quality and acceptability of work and materials which are to be paid for under the contract; shall determine all questions in relation to said work and materials and the performance thereof, and shall in all cases decide every question which may arise relative to the fulfillment and the construction of the terms and provisions of the contract. *His determination, decision and estimate shall be final and conclusive in respect to the fulfillment thereof....*

(Emphasis added).

The importance of clear and unequivocal contractual language is also illustrated by the case of *Laurel Race Course, Inc., supra,* 274 Md. 142, 333 A.2d 319. There, the contract provided that the engineer would issue a final certificate when he found the work acceptable under the contract, and the balance owed to the contractor would then be paid. Moreover, the contract provided:

> "The Engineer shall have general inspection and direction of the work as the authorized representative of the Owner.... He shall also have authority to reject work and materials which do not conform to the plans, specifications and contract documents.... He shall decide all engineering questions which arise in the execution of the work."

> *"The Engineer shall also interpret the meaning and requirements of the plans, specifications and contract documents, and decide all disputes that arise. The Engineer's decisions on these matters shall be final and binding on both the Contractor and the Owner unless both parties agree to submit the dispute to arbitration or either party resorts to legal action for settlement."*

*Id.* at 151–52 n. 3, 333 A.2d 319 (original emphasis omitted; emphasis added).

The contractor argued that the engineer's certificate was a condition precedent to payment only if the parties did not resort to legal action. Conversely, the contractors maintained that, in the event of litigation, the factfinder could determine whether the contract had been satisfied; the absence of an engineer's certificate, said the contractor, did "not bar recovery by the contractor ...." *Id.* at 152, 333 A.2d 319. The *Laurel* Court analyzed the contractual language to determine the import of the engineer's rejection of the contractor's work and subsequent refusal to provide a certificate that was a precondition to payment. The Court recognized the "durability" of

the general rule, followed uniformly by decisions of this Court, that where payments under a contract are due only when the certificate of an architect or engineer is issued, production of the certificate becomes a condition precedent to liability of the owner for materials and labor in the absence of fraud or bad faith.... Apart from fraud or bad faith, the only other exceptions to this rule are waiver or estoppel....

*Id.* at 150, 333 A.2d 319 (internal citations omitted).

However, the Court disagreed with the contractor's construction of the contract. It concluded that the contract clause (italicized above) did not support the contractor's position, because it "completely ignore[d]" the first paragraph and the parties' "manifest intention," gleaned from "the clear and unambiguous language" of the contract. *Id.* at 153, 333 A.2d 319. The Court explained, *id.* (emphasis added):

In accordance with this paragraph, *decisions of the engineer on questions pertaining to performance and execution of the work are controlling and unqualified.* Paragraph 2, however, is confined to disputes arising out of the engineer's role as an interpreter of the technical provisions contained in the various documents. The words 'these matters,' to which the 'legal action' exception applies, pertain solely to

such disputes. In this limited respect only are the engineer's decisions, though otherwise final, subject to the 'legal action' exception.

Thus, the Court concluded, *id.* at 154, 333 A.2d 319 (emphasis added):

As we see it, ... the supremacy of the engineer's certificate on all matters pertaining to conformance and execution survived the resort to 'legal action,' and should not have been ignored, absent a finding of bad faith, fraud, waiver or estoppel. No such finding was made here.[ ] *Hence, production of the engineer's certificate was a condition precedent to the liability of Laurel under count I of the declaration. It is fundamental that* where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused.

*Allied Contractors, supra,* 236 Md. 534, 204 A.2d 546, is also helpful. There, the contract declared, *id.* at 538, 204 A.2d 546: "To prevent disputes and litigations, the Director will be the referee in case any question shall arise ... and his determination, decision, and/or estimate shall be final and conclusive upon the Contractor...." Construing the contract, the Court said, *id.* at 545, 204 A.2d 546:

It is established that when the parties have provided for a binding determination of disputed matters by a designated person, such as an architect or engineer, even though that person is an official or representative of one of the parties, his decision is the equivalent of the award of an arbitrator and like such an award is final and conclusive on both parties in the absence of fraud or mistake so gross as to imply bad faith or the failure to exercise honest judgment.

Because of the binding determination of the third party, the Court rejected the City's claim that "it should have been allowed" to establish a mistake. *Id.* at 546, 204 A.2d 546. It said: "A mistake which will vitiate or invalidate an award must be gross and manifest to the point of showing bad faith

or failure to exercise honest judgment." *Id. See also, e.g., Charles Burton Builders, Inc.,* 260 Md. at 71, 271 A.2d 534 (contract provided, "The Engineer shall in all cases determine the amount, quality and acceptability of the work to be paid for under the contract, and shall decide all questions in relation to said work. *His decision and estimate shall be final and conclusive ....*") (emphasis added); *Hughes v. Model Stoker Co.,* 124 Md. 283, 92 A. 845 (1914) (contract stated, "To prevent disputes and litigations, the inspector of buildings shall in all cases determine all questions in relation to said work .... His estimates and decision *shall be final and conclusive*") (emphasis added).

Even if we were to consider the parol evidence adduced at trial, it does not compel the adoption of Phoenix's position. The extrinsic evidence showed that Phoenix had a long history of poor performance and JHH had reasonable and legitimate concerns about resuming business with Phoenix in 1994, when the Amendment was executed. To be sure, it is equally clear that Grotech considered JHH as vital to the success of Phoenix, and wanted to assure its participation before investing millions of its own dollars. Yet, the parties and Grotech had able counsel; the Amendment could have been crafted to include "final and conclusive" language, consistent with the position Phoenix advances here, if that was, indeed, the intent of all parties. Yet, there is no such phraseology.

In our analysis, for purposes of comparison, we cannot ignore the text of the arbitration clause in the Agreement. *Cf. Moore,* 373 Md. at 191, 817 A.2d 212 (contrasting the imprecise alimony clause with an express agreement as to termination of child support). In the arbitration clause, the parties expressly provided that it was *binding* under certain circumstances. Any attempt to characterize the final authority of the Independent Engineer as tantamount to the binding authority of the arbitrator rings hollow. Indeed, the discrepancy in the language of the two clauses strengthens our view that the parties could have made the Independent Engineer's decision final and conclusive if that was the intent. Instead, their failure to so state leads us to conclude that the determi-

nation of the Independent Engineer was subject to challenge through the judicial process.

We conclude that production of the Certificate is an important step in the process outlined in the Contract, but the parties did not agree that mere production of the Certificate would preclude a challenge to its facial or substantive adequacy, or otherwise deny access to the courts. Although there are valid contracts in which a third party is clothed with authority to render a final and binding decision, this is not one of them. Because the Contract contains no express provision rendering the Independent Engineer's determination "binding" or "final and conclusive," the court below was entitled to determine whether the form of the Certificate complied with the Contract. And, if necessary, the court was also entitled to resolve Hopkins's substantive claim that the Certificate did not provide the requisite "reasonable assurances."

## C.

 We turn to consider whether the court correctly concluded that the form of the Certificate was facially defective. In our view, the trial court erred in finding the Certificate facially defective on the ground that it contained two "assumptions" (i.e., that Phoenix "properly operates and maintains the Facility" and "actually initiates the back-up plan as soon as it cannot process [JHH's] deliveries").

As we see it, Beck merely included in the Certificate language that is inherently implicit in such assurances, i.e., that the contractor or service provider will properly maintain its facility and equipment, and that it will actually implement and initiate the appropriate plan, when needed. The Independent Engineer was not retained as a guarantor to assure that Phoenix would maintain its equipment or deploy it when needed. Beck's assumptions that Phoenix would properly operate and maintain the Facility, and timely execute the contingency plan, reflect factors over which the Independent Engineer had no control. That Beck stated the obvious did not transform its representation into worthless paper.

Notably, in December 1994, when Beck was asked to identify what needed to be included in the Capital Improvement Program, it expressed similar caveats in a letter to Grotech and Phoenix:

> We intend to issue our certificate as described in the [First] Amendment only when, in our professional judgment, the Facility and the Transportation System will be sufficiently reliable. . . . Such a certificate will be based on the assumption that MWA properly operates and maintains the Facility including timely implementation of renewals and replacements, and does not encounter unforeseen circumstances.

We recognize that there may be instances in which the nature or character of an assumption renders a certificate deficient. But, we agree with Phoenix that the two assumptions in issue were tantamount to "common-sense, reasonable, and expected qualifications to an independent and professional opinion." Accordingly, the trial court erred in concluding that, because of the two assumptions, the Certificate was facially deficient.

## D.

 Because we disagree with the circuit court that the form of the Certificate was flawed, the question remains as to whether the Certificate was substantively adequate. As we have shown, Phoenix presented considerable evidence that the problem that led to the Major Backup was rooted in its Facility (i.e., the storage system). Conversely, JHH vigorously argued that the problem was caused by the Transportation System, which Beck never addressed. The court below did not have to resolve this contention, because it determined that the form of the Certificate was facially defective. And, it was of the view that the substance of the Certificate was not subject to judicial review.

As previously outlined, ¶ 13(b)(1)(D) of the Amendment expressly stated that the Independent Engineer must provide "reasonable assurances" that Phoenix made sufficient changes either to the *Transportation System or the Facility* sufficient

to prevent the recurrence of a failure to comply with the agreed upon schedule of pickups." That requirement cannot be considered in a vacuum. Put another way, the use of the word "or" does not mean that the Independent Engineer was entitled arbitrarily to choose which system to analyze—Facility versus Transportation—in order to satisfy the Contract, without regard to which particular system was the cause of the Major Backup.

The plain reading of the Contract (as well as the extrinsic evidence) makes clear that the parties intended the Certificate to assure JHH of resolution of the particular cause or causes of a Major Backup. The intent behind the Certificate requirement would be thwarted if a Certificate were deemed sufficient to satisfy the requirement of ¶ 13(b)(1)(D) based on reasonable assurances as to a system that did not cause the problem that necessitated the need for the Certificate in the first place.

Certainly, the Contract was not meant to give the Independent Engineer the unbridled option to provide reasonable assurances as to the Facility *or* the Transportation System, without regard to which system precipitated the underlying problem. If the engineer addressed issues as to the Facility, for example, but the cause of the backup was rooted in the Transportation System, then a Certificate addressing matters as to the Facility would not serve the purpose contemplated by the parties. Common sense and logic suggest that the Contract necessarily required the engineer to first identify whether the cause of the underlying problem was due to the Facility or the Transportation System, or both. Therefore, we conclude that Phoenix was obligated to furnish a Certificate providing reasonable assurances that Phoenix made necessary changes to whatever system was, in fact, the cause of the Major Backup.

Kosstrin testified that, at the time he conducted his investigation, he believed the Major Backup was caused by "insufficient storage ... to handle th[e] waste that was coming in at that time[.]" He conceded, however, that, during Beck's

investigation, Plank informed him that, at the time the Notice of Suspension was issued on January 16, 2003, Phoenix still had space for nine tons of waste, which "would have taken [care of] a large chunk" of the Major Backup.

Claiming that the Certificate addressed issues that were not the cause of the backup, JHH argues:

> An equally obvious deficiency in the certificate, and in Kosstrin's analysis, was its silence concerning the Transportation System. The Amendment requires that the certificate address "changes to the Transportation System or the Facility" and certify future compliance with the pickup schedule; the Transportation System was plainly intended to be at the heart of the independent engineer's work. But the certificate offered no analysis of or reference to the Transportation System and proposed no changes to it. Thus, the certificate addressed an issue that was *not* the cause of the missed pickups—storage—but failed to address what clearly *was* one of the causes of the backup: Phoenix's innumerable late and missed pickups when the incinerators were functioning properly.
>
> * * *
>
> It is impossible to provide [reasonable] assurances without so much as mentioning the Transportation System, particularly when pickups are late week after week. But Kosstrin prepared a certificate that purported to do so, based on two false premises: the Major Backup was caused by the saturation of Phoenix's storage, and Phoenix's Transportation System functioned near perfection.

Clearly, the Certificate did not address the Transportation System. And, as noted, the trial court did not make any findings as to the cause of the Major Backup or the sufficiency of the Transportation System, because it resolved the matter on a different ground.

As an appellate court, it is not our province to make such factual determinations. *See, e.g., Hartley v. State,* 238 Md. 165, 168, 208 A.2d 72 (1965) ("[O]ur powers are limited to appellate review and we cannot invade the province of the *nisi*

*prius* courts by making an original factual finding."); *see also Montgomery Co. v. Maryland Soft Drink Ass'n.*, 281 Md. 116, 122, 377 A.2d 486 (1977) ("We cannot, of course, make a factual finding."). Therefore, we shall vacate the judgment and remand for further proceedings. In doing so, we express no opinion as to the cause of the Major Backup or the substantive sufficiency of the Certificate.

## E.

For the benefit of the parties on remand, we shall briefly consider JHH's challenge to the validity of the Certificate based on the fact that Kosstrin is not licensed as a professional engineer. We agree with appellant and the circuit court that this claim lacks merit.

The court below found that Beck, not Kosstrin, was the Independent Engineer. That finding was amply supported by the record.

As the trial court noted, the certificate is on R.W. Beck's letterhead and is signed by R.W. Beck. Moreover, the first sentence of the Certificate states that the engineering firm R.W. Beck is the Independent Engineer. And, the Contract refers to the Independent Engineer as R.W. Beck.

Furthermore, as the trial court said, the "termination" letter of February 25, 2003, indicates that JHH regarded the Certificate as one provided by R.W. Beck, not Dr. Kosstrin individually. In that letter, JHH refers to "Beck's certificate"; "Beck's conclusions," "Beck's reason[ing]"; "Beck's analysis"; and "Beck's calculation[s]." Thus, it is readily apparent that JHH clearly understood that the Certificate was provided by R.W. Beck, the Independent Engineer identified in the Contract.

In addition, Kosstrin testified that the content of the Certificate was reviewed by Rush, an experienced licensed engineer. And, appellee agreed to have Beck furnish the Certificate. Therefore, its challenge on this basis is not persuasive.

As to the licensure of Beck, the issue was not raised below. Therefore, it is not preserved. *See* Md. Rule 8–131(a).

### F.

 Finally, we briefly consider appellant's evidentiary challenge to the court's refusal to admit evidence concerning Phoenix's post-termination performance. In its written opinion, the court explained: "The Court granted JHH's Motion in Limine excluding evidence of how Phoenix picked up JHH's trash after the Notice of Termination was issued, because the determination of whether the Certificate provides reasonable assurance. must be made on the face of the Certificate."

We agree with JHH and the circuit court that evidence as to post-termination performance was not relevant. It follows that the court did not err or abuse its discretion in barring its admission. We explain.

 The admissibility of evidence is generally vested in the sound discretion of the trial court. *See Mason v. Lynch*, 388 Md. 37, 48–50, 878 A.2d 588 (2005); *Conyers v. State*, 354 Md. 132, 176, 729 A.2d 910, *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Hopkins v. State*, 352 Md. 146, 158, 721 A.2d 231 (1998); *see also* Md. Rule 5–104(a) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court"). As a general rule, in order for evidence to be admissible, it must be relevant to the issues in the case and tend either to establish or disprove them. *Snyder v. State*, 361 Md. 580, 591, 762 A.2d 125 (2000); *Conyers*, 354 Md. at 176, 729 A.2d 910; *Rosenberg v. State*, 129 Md.App. 221, 252, 741 A.2d 533 (1999), *cert. denied*, 358 Md. 382, 749 A.2d 173 (2000).

 Maryland Rule 5–401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Trial courts "retain wide latitude in determining what evidence is material and relevant." *Merzbacher v. State*,

346 Md. 391, 413, 697 A.2d 432 (1997). Thus, "[a] trial judge's determination on relevance will not be reversed absent an abuse of discretion." *Williams v. State,* 342 Md. 724, 737, 679 A.2d 1106 (1996), *overruled on other grounds, Wengert v. State,* 364 Md. 76, 771 A.2d 389 (2001); *see Mason v. Lynch,* 388 Md. at 48–50, 878 A.2d 588; *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, *cert. denied,* 519 U.S. 832, 117 S.Ct. 102, 136 L.Ed.2d 56 (1996).

Here, the issues concerned the entitlement of JHH to terminate the Contract based on its claim that, at the time it was issued, the Certificate was flawed. Appellant's post-termination performance was not relevant in determining whether the Certificate provided the requisite reasonable assurances, or in deciding whether JHH acted lawfully in terminating the Contract. We adopt the reasoning advanced by JHH in the court below:

> [T]he termination decision was required to be made, and was made, based on the sufficiency of the assurances at the time they were given. . . . Just as JHH (had it determined that the Certificate provided reasonable assurances) could not look at actual performance a year later, find it deficient, and retroactively terminate on the ground that the assurances turned out not to have been reasonable, Phoenix cannot now judge the assurances based on its performance during the year that followed.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT, 50% BY APPELLEE.**